UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **In re:** | **CHAPTER 7** |
| **KARL C. HANSEN AND LISA H. HANSEN,** | Case No. 1:2-BK-11907-JMD |
| Debtors, | Hearing Date: April 12, 2017<br>Hearing Time: 9:00 AM |

**DEBTORS' OBJECTION/COUNTEROFFER TO TRUSTEE'S MOTION FOR SALE OR OTHER DISPOSITION OF PATENT ASSETS (Dkt. No. 103)**

Karl C. Hansen and Lisa H. Hansen ("Debtors") and SyncPoint Imaging, LLC (collectively "Syncpoint") hereby object to the private sale for $150,000 ("Purchase Price") to Pixart Imaging, Inc. ("PixArt") of the estate's right, title and interest in and to the Assets as defined in the Motion. Syncpoint objects to the proposed sale to PixArt on the basis that it is not in the best interest of the estate since (1) the Purchase Price does not reflect the fair market value of the Assets; and (2) it would deprive the Debtors of their surplus interest in the estate. Instead, Syncpoint urges the Court to adopt its proposal ("Syncpoint Proposal") as set forth in the Stipulation Concerning Patent Rights dated February 21, 2017. (*See* Dkt. No. 101).

**MEMORANDUM IN SUPPORT OF OBJECTION/COUNTEROFFER**

**I.      INTRODUCTION**

This Court should reject the proposed sale to PixArt because the Purchase Price grossly undervalues the fair market value of the Assets to the detriment of the Debtors' surplus rights in the estate. In particular, Debtor Karl C. Hansen ("K.Hansen") is the inventor of the technology covered by the patents that form part of the Assets. PixArt previously entered into a license agreement ("License Agreement") allowing PixArt to practice the inventions covered by these patents. However, PixArt breached the License Agreement by selling product without paying the required royalty due under the License Agreement. In fact, PixArt underpaid its obligations under the License Agreement in the amount of $28 million. Debtor K.Hansen subsequently assigned his rights to the Assets and his rights to sue PixArt for breach of contract to SyncPoint Imaging, LLC.

In 2015, SyncPoint brought suit in the Eastern District of Texas against Nintendo of America, Inc.; Nintendo Co., Ltd. (collectively "Nintendo"); and PixArt for patent infringement and breach of contract ("Texas Litigation").[1] As part of the Texas Litigation, SyncPoint alleged that PixArt breached the License Agreement by selling CMOS sensors to Nintendo for inclusion in Nintendo's Wii gaming systems without paying the required royalty due under the License Agreement. Accordingly, Syncpoint is seeking damages against PixArt in excess of $28 million, plus interest, for breach of contract.

In a deliberate strategy to avoid being found liable for the $28 million in royalties due under the License Agreement, PixArt is believed to have informed the Chapter 7 Trustee

---

[1] *SyncPoint Imaging, LLC v. Nintendo of America, Inc., et al.,* Case No. 2:15-cv-00247-JRG-RSP.

2

("Trustee") in this bankruptcy proceeding of the Texas Litigation. Upon learning of the Texas Litigation, the Trustee subsequently moved this Court *ex parte* to reopen the bankruptcy, which it did on September 3, 2015. (*See* Dkt. No. 29). Then, on January 21, 2016, the Trustee signed an Asset Purchase Agreement with PixArt, ostensibly giving PixArt the right to purchase the Assets at the Purchase Price, which price is a mere fraction of its liability for the breach of contract claim. (*See* Dkt. No. 103-1, Ex. A).

Syncpoint objects to the proposed sale to Pixart because the Purchase Price is grossly inequitable in light of Syncpoint's breach of contract claims for $28 million. This is especially true in light of Syncpoint's likely success of its breach of contract claim. Further, because the outstanding creditor claims filed in this proceeding amount to only about $19,000, Syncpoint's interest in recovering the surplus from a $28 million award should be controlling.

Lastly, PixArt's Proposal should be rejected because any current value to the Assets was created by Syncpoint subsequent to the original Order Discharging Debtor on December 13, 2012. That is, the only reason why PixArt is now offering to purchase the Assets is because of the Texas Litigation. The amount PixArt offers is equal to the creditors' $19,000 and the Trustee's six figure fee. To be clear, without Syncpoint's significant investment in the Texas Litigation after the Debtors' bankruptcy discharge, the Assets would have little or no value. In fact, PixArt refused to renew the License Agreement in 2012 because it considered it to be of no value to its business. Moreover, it was PixArt's failure to pay the required royalties that contributed to the Debtors' need to file for bankruptcy. Under these facts, it would be manifestly unjust for this Court to completely deprive Syncpoint of any fruits of the Texas Litigation,

3

especially where it was Syncpoint's substantial efforts subsequent to the Debtors' Chapter 7 discharge that created the value to the Assets in the first place.

Based upon the foregoing and the below, this Court should reject PixArt's Proposal and should choose the option that is in the best interest of the estate and the debtor.

## II. ARGUMENT

### A. This Court Should Adopt Syncpoint's Proposal Because of the Likelihood of Success On its Breach of Contract Claim

In its Motion, the Trustee admits that Syncpoint Proposal is preferable—but only if Syncpoint has a good chance of success on its breach of contract claim against PixArt. As will be explained below, Syncpoint indeed has a high likelihood of success on its claim against PixArt for past royalties under the License Agreement.

#### 1. *The License Agreement*

In June of 2008, Debtor K. Hansen and PixArt entered into the License Agreement for those identified patents that form part of the Assets ("Licensed Patents"), including U.S. Patent No. 6,275,214 ("the '214 Patent"). (*See* Exhibit A, § 1.3). Pursuant to the License Agreement, Debtor K. Hansen granted to Pixart "a personal, nonexclusive, nontransferable, limited license" to the Licensed Patents. (*Id.* at § 2.1). The term of the License Agreement was from July 1, 2008 until September 30, 2012, a period of four years and three months. (*Id.* at §§ 1.1 & 1.2).

The License Agreement required PixArt to pay royalties according to a tiered schedule and based upon the number of CMOS sensors that it sold. (*Id.* at § 3.1.1). Under the tiered schedule, PixArt was required to pay a minimum annual royalty amount of $50,000 if the number of CMOS sensors it sold annually was under 180,000. (*Id.*). If PixArt sold more than

4

180,000 sensors in a reporting year, it was required to pay additional royalties according to the tiered schedule. (*Id.*). Throughout the term of the Agreement, PixArt never paid more than the minimum royalty amount of $50,000 per year. After the termination of the License Agreement, a dispute arose between Hansen and PixArt as to whether PixArt was required to pay an additional $28 million in royalties for the sale of certain PixArt CMOS sensors to Nintendo and that were incorporated by Nintendo into its popular Wii gaming systems.

### 2. The PixArt CMOS Sensors Sold to Nintendo Are Royalty Bearing Products under the License Agreement

Pursuant to the License Agreement, a "Licensed Product" for which royalties are due "means any product or part thereof containing a CMOS sensor and software/firmware/hardware essential for function of product or part" that, absent the License Agreement, "would infringe one or more claims of the Licensed Patents …." (*Id.* at §§ 1.10 & 1.10.1). Thus, the determination of what constitutes a royalty bearing "Licensed Product" under the License Agreement collapses into a patent infringement analysis. The Nintendo Wii gaming systems that incorporate PixArt's CMOS sensors infringe at least claim 25 of the '214 Patent and, therefore, are royalty bearing products under the License Agreement.

A determination of patent infringement by a court in the United States is a two-step process. First, the scope of the claims is ascertained (claim construction), and then the court decides whether the claimed invention has been infringed (*i.e.*, whether the claims as properly interpreted cover the accused product). *See Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004). In regard to claim construction, the federal court in the Texas Litigation has already issued a claim construction order construing the relevant terms for

5

claim 25 of the '214 Patent as shown in the table below. (*See* Exhibits B ('214 Patent) & C (Claim Construction Order, pp. 25, 34, and 43)).

| CLAIM TERM | COURT CONSTRUCTION |
|---|---|
| "external cursor" | "movable visible mark that is generated by some device other than the computer and that indicates a position on the display for the output of the computer" |
| "at least one . . . properties" | "at least one . . . properties that is not position" |
| "instructions for generating. . ." | Plain and ordinary meaning. |

With the relevant '214 Patent claim terms already construed, Syncpoint will now show that claim 25 covers Nintendo's Wii and, therefore, it is a royalty bearing product under the License Agreement. Prior to proceeding, however, Syncpoint will give a short explanation of the technology of the '214 Patent.

According to the '214 Patent, the object of the invention was to remotely control a computer presentation, "based on characteristics of an optical pointer used to superimpose a cursor or visual cue onto a projected image of a computer screen." The specification describes the parts of the preferred embodiment with reference to Figure 1, shown below.



*Fig. 1*

As shown in Figure 1, above, a computer presentation is projected by a connected projector (12) onto a screen (16). The presenter uses a pointer, like laser pointer (24), to point to the presentation on the screen, resulting in a light dot (22). A camera (14) captures an image of the light dot (22). The computer (10) then uses the captured image to detect the location of the light dot (22) on the screen (16) and moves the computer's cursor (26) to where the light dot (22) is.

The patent calls both the computer's cursor (26) and the light dot (22) from the laser pointer (24) "cursors," but appends the adjectives "internal" and "external" to distinguish between the two. The computer's cursor is an "internal cursor" because it is generated by the computer, and the laser pointer's cursor is an "external cursor" because it is generated by a device other than the computer, such as by a handheld laser pointer.

Claim 25 and its coverage of the Nintendo Wii is readily established:

> 25. A computer readable storage medium having stored data representing instructions executable by a computer to generate commands to control a cursor generated by the computer based on a plurality of user controllable properties of an external cursor, the computer readable storage medium comprising:
>
> instructions for detecting at least one of the user selectable properties of the external cursor; and
>
> instructions for generating a command for the computer based on the at least one detected property of the external cursor.

Claim 25 is known as a computer readable medium ("CRM") or *Beauregard*[2] claim. Unlike a method claim, a CRM claim enjoys the benefit of being infringed if the claimed

---

[2] Named after *In re Beauregard,* 53 F.3d 1583 (Fed. Cir. 1995), "[c]laims in *Beauregard* format formally recite a tangible article of manufacture—a computer readable medium, such as a computer disk or other data storage device—but such claims also require the device to contain a computer program for directing a computer to carry out a specified process." *CLS Bank Int'l v. Alice Corp. Pty*, 717 F.3d 1269, 1287 (Fed. Cir. 2013).

instructions are present on the computer readable medium of the accused device as computer code even if the instructions are never or rarely executed. For example, in *Finjan v. Secure Computing Corp.,* the Federal Circuit affirmed that the defendant's security appliances infringed the plaintiff's CRM claim even though the defendant sold its devices with the relevant software disabled and the customer had to purchase a key to activate it. 626 F.3d 1197, 1203-1204 (Fed. Cir. 2010). The court reasoned that, "to infringe a claim that recites capability and not actual operation, <u>an accused device need only be capable of operating in the described mode</u>." *Id.* at 1204 (underlining added).

PixArt's main defense to the Wii being covered by claim 25 is that the Wii uses invisible light and not a visible external cursor. However, as will be demonstrated below, the Wii is capable of operation using various types of visible external cursors as required by claim 25. In fact, it is well known that the Nintendo Wii is capable of using an external cursor that is visible to a user, including, for example, lit candles, ordinary lights, flashlights, and even hand-held laser pointers.

First, in regard to the use of candles, or better said, the flames of candles, as a visible external cursor for the Wii, one only need perform a search on YouTube using the search string "Wii candles." Such a search will return search results that include multiple links to user videos of the kind shown below.[3]

---

[3] Actual video may be viewed on YouTube as of the date of this motion at: https://www.youtube.com/watch?v=DYzN34p3CqU&t=101s

8



Syncpoint's own investigation shows that the Wii gaming system can operate using a visible cursor in the form of lit candles as shown in the image below:



Second, YouTube also has videos by users showing the use of ordinary lights as visible external cursors for the Wii as shown in the screen shot below:[4]



---

[4] Actual video may be viewed on YouTube as of the date of this motion at: https://www.youtube.com/watch?v=QDMJr3AiVvQ

9

Third, YouTube also has videos by user showing the use of handheld flashlights may as visible external cursors for the Wii as shown in the image below:[5]



Syncpoint's own investigation has confirmed that the Wii gaming system can operate using visible external cursors in the form of light spots from ordinary flashlights projected onto the screen as shown in the image below:

---

[5] Actual video may be viewed on YouTube as of the date of this motion at: https://www.youtube.com/watch?v=7IBmzZhLwAo



Fourth, Syncpoint has further confirmed that handheld laser pointers may also be used to generate visible external cursors in the form of laser dots projected onto the screen that are detectable by the Wii as shown in the image below (laser dots are green):



Based upon the above, it is clear that the Wii is capable of using a visible external cursor as required by claim 25. Thus, because the computer instructions for the Wii are capable of performing the functions recited in claim 25 using a visible external cursor, the Wii infringes

11

claim 25. Accordingly, PixArt was and is required to pay royalties on the CMOS sensors sold to Nintendo and incorporated into the Wii under the License Agreement.

### 3. *The Subsequent Invalidity of a Licensed Patent Does Not Relieve PixArt of Its Obligation to Pay Royalties under The License Agreement*

Under the terms of the License Agreement, PixArt's obligation to make royalty payments for its sales of its CMOS sensor to Nintendo during the term of the License Agreement is/was not relieved even though the claims of the '214 Patent have recently been found invalid by the U.S. Patent Office (through *inter partes* review and reexamination). Section 5.4 of the License Agreement is clear that PixArt is liable for all for all royalties that had accrued as of the date of termination. (Exhibit A, § 5.4). As the term of the License Agreement naturally ended in September of 2012, and the claims of the '214 Patent were not found invalid by the U.S. Patent Office until 2017, PixArt is liable for all royalties due under § 5.4. Thus, the invalidity of all of the claims of the '214 Patent only impacts Syncpoint's patent infringement claims against PixArt and Nintendo, and not Syncpoint's breach of contract claims against PixArt.

### 4. *Syncpoint Concedes That the Remaining Royalty Dispute With PixArt Must Proceed According to the Arbitration Clause in the License Agreement*

In light of the invalidation of the patent claims of the '214 Patent, which effectively moots Syncpoint's patent infringement claims, Syncpoint concedes that the remaining royalty dispute with PixArt must be resolved through binding arbitration as required by § 10 of the License Agreement.

12

### 5. *PixArt's Equitable and Statute of Limitations Defenses Will Not Be Heard in the Arbitration Proceeding*

PixArt argues that under the choice of law provision in the License Agreement that the 3-year statute of limitations of New Hampshire applies in this case to bar Syncpoint's breach of contract claim. However, PixArt ignores the fact that New Hampshire's statute of limitations only applies to "personal actions" and not to arbitration proceedings. *See* RSA § 508:4. That is, there is no statute of limitations that applies in or to an arbitration proceeding between the parties under the License Agreement that would bar Syncpoint's breach of contract claim.

Moreover, under the License Agreement, the parties expressly agreed that the arbitrators would not have the power to decide issues related to statutes of limitation and equitable defenses. In this regard, the License Agreement specifically states that the power of the arbitrators "shall be limited to resolving the specific issues stated by determining the royalties [PixArt] owes or should received credit for, if any, under this AGREEMENT" and that "[t]he power of the arbitrators shall not extend to any other matters." (*See* Exhibit A, § 10.1.2). Accordingly, at the time of the formation of the License Agreement, the parties chose not to grant to the arbitrators the power to determine issues related to statute of limitations and equitable defenses, including latches and estoppel. Further, under § 10.1.1 of the License Agreement, the amount of royalties determined by the arbitrators is immediately reducible to judgment. (*See* Exhibit A, § 10.1.1). Thus, in the arbitration proceeding, the arbitrators will not consider PixArt's equitable and statute of limitations defenses due to the express limitations imposed on their powers by the License Agreement.

Further, under the express limitation of powers imposed by the License Agreement on the arbitrators, PixArt will be precluded from raising its assertion that the License Agreement was

not an installment contract. That is, the arbitrators are limited to determining all past royalties due regardless of whether or not the License Agreement was or was not an installment agreement. (*See* Exhibit A, § 10.1.2).

Lastly, even if the breach of contract dispute were to remain pending in the Texas federal court, that court would apply Texas' 4-year statute of limitations as opposed to the 3-year New Hampshire statute of limitations, barring any facts raised by Syncpoint that would abrogate the application of the statute of limitations. In the recent case of *Western-Southern Live Assurance Company v. Kaleh*, 193 F.Supp.3d 756, 770-71 (2016), the trial court found that if a "statute of limitations is not an express provision in the cause of action creating the right to the suit" then the statute of limitations of the forum state applies. In *Western-Southern*, the trial court applied the Texas statute of limitations even though the parties' agreement included an Ohio choice-of-law provision. *Id.* In other words, federal courts view statute of limitations as procedural law and not substantive law unless the statute of limitations is part of the cause of action creating the right to the action. *Id.* Accordingly, the 4-year Texas statute may apply if this matter remains before the Texas federal court and barring any facts that would preclude its application. Importantly, the contractual damages in the case  increase in this matter increases from under $1 million to approximately $4.6 million, with accruing interest, between applying a 3-year statute of limitations and a 4-year statute of limitations. However, as explained above, because the parties have agreed that the breach of contract dispute will be heard in arbitration, no statute of limitations or equitable defenses apply and Syncpoint will be able to recover the entire $28 million.

In short and for the reasons stated above, Syncpoint has a high likelihood of prevailing in the arbitration.

**III. ROYALTIES UNDER THE LICENSE AGREEMENT CONSTITUTE ACTUAL DAMAGES THAT ARE NOT SPECULATIVE**

In return for license under the Agreement, PixArt agreed to pay K.Hansen a minimum royalty of $50,000 a year for sales less than 180,000 of the Licensed Products. Sales exceeding 180,000 resulted in increasing royalty payments as follows:

| 3.1.1 Schedule A | |
|---|---|
| 3.1.1.1 CMOS SENSORS | Amount due |
| 0-180K | $50,000 US per REPORTING YEAR |
| 180,001-1,000,000 | greater of (5% or $0.10 US) NSP |
| 1,000,001-5,000,000 | greater of (4.5% or $0.09 US) NSP |
| 5,000,001+ | greater of (4% or $0. 80 US) NSP |

SyncPoint's independent damages expert, Clarke Nelson of the nationally recognized Berekley Research Group, undertook a detailed analysis of royalties due under the License Agreement in his expert report ("Nelson Report"), attached hereto as Exhibit D and filed under seal. As shown in the Nelson Report, the damages for breach of contract are clearly not speculative but constitute actual calculable damages in accordance with the express language of the contract. Specifically, had PixArt operated in accordance with the Agreement and properly assessed the CMOS sensors sold to Nintendo, it should have paid millions of dollars, which now total more than $28 million. PixArt's recent attempt to use the bankruptcy as a mechanism to purchase the Assets for $150,000 (less than 1% of what it owes) is contrived solely to avoid liability. Such a sale is clearly not in the best interests of the estate and the debtor.

Moreover, any current value to the Assets was clearly created by Syncpoint after the discharge of the Debtors' bankruptcy. Indeed, PixArt refused to renew the License Agreement in

15

2012, but is now willing to pay the Purchase Price? The Debtors themselves created this value by investing their own precious time and resources to pursue its claims against PixArt. Based upon the above, it would be unjust to allow PixArt to avoid paying past due royalties.

### IV. CONCLUSION

For the forgoing reasons, PixArt's Proposal must be rejected, and Syncpoint's Proposal should be accepted as it is the only proposal that is in the best interests of the estate and the debtor.

Respectfully submitted,

Dated: April 5, 2017

By: */s/* Joseph G. Pia
Joseph G. Pia
joe.pia@padrm.com
Utah State Bar No. 9945 (*pro hac vice*)
Robert Aycock
Utah State Bar No. 8878
raycock@padrm.com
PIA ANDERSON MOSS HOYT
136 E. South Temple, 19th Floor
Salt Lake City, Utah 84111
Telephone: (801) 350-9000
Facsimile: (801) 350-9010

Carl D. Hanson
carl@hansonandnolin.com
HANSON AND NOLIN, LLP
276 Newport Road
Suite 204 The Gallery
New London, NH 03257

## CERTIFICATE OF SERVICE

I, Joseph G. Pia, hereby certify that a copy of the foregoing DEBTORS' OBJECTION/COUNTEROFFER TO TRUSTEE'S MOTION FOR SALE OR OTHER DISPOSITION OF PATENT ASSETS (Dkt. No. 103) has been sent this 5th day of April 2017, via the Court's ECF/electronic mail to all parties on the Court's Electronic Service List.

Dated: April 5, 2017                    By: */s/* Joseph G. Pia