UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re:<br><br>KARL C. HANSEN AND LISA H. HANSEN,<br><br><br>Debtors. | Chapter 7<br><br>Case No. 12-11907-JMD<br><br>Hearing Date:  April 12, 2017<br>Hearing Time:  9:00 a.m. |

**THIRD-PARTY PIXART IMAGING, INC.'S
AMENDED PRETRIAL MEMORANDUM IN SUPPORT OF
TRUSTEE'S SALE OF ASSETS TO PIXART IMAGING**

Pursuant to paragraph 11 of the Court's Final Pretrial Scheduling Order [Docket No. 106], PixArt Imaging, Inc. ("PixArt") submits this amended memorandum setting forth the reasons that its bid is the highest or best offer for the Patent Assets (as defined in the Chapter 7 Trustee's Motion for Sale or Other Disposition of Patent Assets filed March 22, 2017, referred to herein as the "Sale Motion" [Docket No. 103]), and describing the defenses and issues of the Patent Case (as defined in the Sale Motion), including its assessment of the likelihood of success and the amount of any likely judgment.[1]  PixArt seeks to purchase said assets pursuant to the Purchase and Sale Agreement it entered into with the Trustee on January 21, 2016.  Exh. 101.

I.      BACKGROUND

    A.      The District Court Litigation

SyncPoint Imaging LLC ("SyncPoint"), owned by Debtor Karl C. Hansen ("Hansen"), filed an action against Nintendo of America Inc., Nintendo Co., Ltd. (collectively "Nintendo"), Game X Change, Inc., Games2Go, and PixArt in the Eastern District of Texas, Marshall Division, on February 20, 2015, alleging infringement of U.S. Patent No. 6,275,214 (the '214 patent) by all defendants, and breach of contract by PixArt.  Exh. 102.  As to the breach of contract claim, SyncPoint alleges that PixArt entered into a License Agreement, Exh. 103, with Hansen, the inventor of the '214 patent, in 2008, that PixArt made unauthorized sales to Nintendo of components covered by the License Agreement, and that Nintendo used these components in infringing products, i.e., the Nintendo Wii and Wii U gaming systems ("collectively, the Nintendo Wii"), sold and used in the United States and other countries where Hansen held patents.  The License Agreement had effective dates from July 1, 2008 through

---

[1] This document amends the identical memorandum filed by PixArt on April 5, 2017 [Docket No. 114], to correct a filing error.

September 30, 2012.

The district court litigation was stayed on January 7, 2016 at the request of SyncPoint, pending disposition of the proceedings before this Court regarding ownership of the asserted patent. The case remains stayed. Prior to the stay, the court held a claim construction hearing[2] and issued its claim construction order.[3] Much of the fact discovery was completed, including the depositions of Debtors Karl and Lisa Hansen, but expert discovery had not been completed. Various motions by the parties were pending when the action was stayed, including PixArt's motion to dismiss for lack of personal jurisdiction and improper venue, and its motions to enforce the arbitration provision of the License Agreement and to stay the litigation pending arbitration. The district court recently denied all pending motions in light of the stay, subject to renewal by the parties if/when the stay is lifted. PixArt has yet to answer the Complaint, and if the stay is lifted, will again seek dismissal of the action for lack of personal jurisdiction, and will seek to enforce the arbitration clause of the License Agreement.

### B.    Patent Office Challenges to Validity of the '214 Patent

Defendants in the district court litigation also sought a stay pending the outcome of two challenges to the validity of the '214 patent.[4] PixArt filed a request for Inter Partes Review with

---

[2] In patent parlance, a "claim" is a sentence at the end of the patent that defines, in technical terms, the scope of the legal protection conferred by the patent. Most patents have multiple claims. The '214 patent, as issued, has 26 claims. In patent infringement litigation in the federal courts, "claims" of patent infringement refer to causes of action alleging infringement of one or more patent claims.

[3] The district court's claim construction is pertinent insofar as both the claim for breach of contract and the patent infringement claim against PixArt and Nintendo will require a determination whether the CMOS sensors sold by PixArt to Nintendo fall within the scope of LICENSED PATENTS, particularly the '214 patent.

[4] The Court held that whether the stay should continue in light of the pending validity challenges would be decided when, and if, SyncPoint moves to lift the stay related to patent ownership.

the Patent Trial and Appeals Board ("PTAB"), and a third party separately filed a request at the Patent Office for ex parte reexamination of the '214 patent.  As a result of those challenges, all claims of the '214 patent currently stand as invalid, as discussed in more detail below.

### C.    PixArt's Offer to Purchase the Patent Assets of the Bankruptcy Estate

Upon being sued by SyncPoint for infringement of the '214 patent and for breach of the License Agreement, PixArt undertook an investigation of the ownership and validity of the '214 patent in preparation for its defense.  That investigation led to PixArt's review of the bankruptcy petition filed by Karl and Lisa Hansen with this Court in 2012, prior to the expiration of the License Agreement.  Docket No. xx.  Based on that review, PixArt concluded that Hansen misled this Court when he claimed in the Voluntary Petition filed on June 11, 2012 that the patent assets he held had no ($0) value, because one of those patents is being asserted against PixArt in the district court litigation.  Exh. 104 (Schedules B and C to Voluntary Petition).[5]

When PixArt learned that SyncPoint had sought to reopen the Hansen's bankruptcy, it approached the Trustee and offered to purchase the Patent Assets[6] for an amount that would

---

[5]In its damages expert report submitted on December 17, 2015, SyncPoint claimed damages in the amount $28,627,109 related to PixArt's sale of its CMOS sensors to Nintendo for use in the allegedly infringing Wii gaming systems.

[6] "Patent Assets" are defined in the present Trustee's Motion as "the following domestic and foreign patents: US6275214B1, US6952198B2, US7091949B2, EP1200955B1, DE60023900T2, CA2378154C, JP2003504705A(JP4822643B2), and AU200057549A, which Hansen licensed to PixArt Imaging, Inc. ("PixArt") on or about June 26, 2008, pursuant to a Non-Exclusive License Agreement (the "PixArt License Agreement"), and all rights associated with such patents.

The Purchase and Sale Agreement entered by the Trustee and PixArt on January 21, 2016 states that "Buyer [PixArt] agrees to buy the Debtor's interest in the following domestic and foreign patents:  US6275214B1, US6952198B2, US7091949B2, EP1200955B1, DE60023900T2, CA2378154C, JP2003504705A(JP4822643B2), and AU200057549A, and all rights associated with said patents, including rights that Debtor may have pursuant to the License Agreement related to said patents, the same to be held by Buyer for Buyer's own use and enjoyment, and for the use and enjoyment of Buyer's successors, assigns and other legal representatives, as fully and

satisfy the creditors and pay the Trustee's administrative fees, up to $150,000.  That offer, considered in light of testimony by Karl Hansen in the district court litigation that he believed that the patent he owned had value and that he had a potential infringement action at the time of his bankruptcy filing despite contrary assertions in both his bankruptcy Schedules and in his testimony at the Section 341 Meeting of Creditors,[7] Exh. 105, led to the Chapter 7 Trustee's Motion for Authority to Sell by Private Sale Certain Assets, filed on December 22, 2015 [Docket No. 39], and ultimately the Sale Motion now before the Court.

II.    **PIXART'S BID OFFERS CERTAINTY AND IS CLEARLY SUPERIOR TO SYNCPOINT'S BID, WHICH DEPENDS ON PREVAILING IN LITIGATION THAT HAS A DE MINIMIS CHANCE FOR SUCCESS AND WILL DELIVER AT MOST MODEST DAMAGES**

---

entirely as the same would have been held and enjoyed by the Debtor if this sale and transfer had not been made, and all claims for damages and other remedies for past and future infringements of the patents, along with the right to sue for and collect such damages and other remedies for the use and benefit of Buyer and its successors, assigns and other legal representatives."

[7] Hansen's testimony at the Section 341 Meeting of Creditors reiterated the information written on Schedules B and C, and wholly contradict his testimony and SyncPoint's pleadings in the district court litigation:

>     Ms. Gordon:  Okay.  And the term on that [PixArt] license was up; they didn't reach a contract with your, right?
>     Mr. Hansen:  No, right. The term actually ends in August, end of August.
>     Ms. Gordon:  Um-hum, but they're not going to renew?
>     Mr. Hansen:  And they've already said back in January we don't—they said they renew for free but—
>     Ms. Gordon:  Um-hum.
>     Mr. Hansen:  --so would I but I need the money.
>     Ms. Gordon:  Um-hum.  Okay.  And you don't have any basis to bring litigation against anyone for anything?
>     Mr. Hansen:  No.

Section 341 Meeting Tr. at 8:2-13 (Exh. 105)

This Court is presented with two options. It can approve the sale of the Patent Assets to PixArt for $150,000, which will ensure that the unpaid creditors of the bankruptcy estate are made whole and that the Trustee's fees and administrative expenses are paid in whole or substantial part. Alternatively, it can play the lottery by allowing SyncPoint to pursue its district court action seeking millions of dollars in damages against PixArt and possibly Nintendo. The former option offers certainty; the latter option is demonstrably inferior inasmuch as it presents minimal likelihood of recovering at least $150,000 for the estate.

### A. The Likelihood of SyncPoint Prevailing on Any Patent Infringement Claim is Essentially Zero

To succeed on its claim for patent infringement, SyncPoint must prove that at least one valid claim of the '214 patent has been infringed. Inherent to that requirement is that there is at least one valid claim of the '214 patent that can be presented to the district court. However, the likelihood of any claim of the '214 patent being valid is extremely low, as not one but two branches of the United States Patent Office have independently held that the claims of the '214 patent are invalid.[8] In fact, as of March 26, 2017, it appears that SyncPoint has abandoned efforts to save even a single claim of the '214 patent.

### 1. The Patent Office Invalidated All Claims of the '214 Patent in an Ex Parte Reexamination

On May 13, 2015, a third party requested Patent Office ex parte reexamination of all claims of the '214 patent. The reexamination request was assigned to a patent examiner in the Patent Office's Central Reexamination Unit, and was granted. On January 26, 2017, the examiner issued a Final Office Action, finding all claims invalid under 35 U.S.C. § 103, and

---

[8] It is extremely unusual—if not the first time—that two branches of the Patent Office have simultaneously and independently invalidated the same patent.

also rejecting claims added by SyncPoint during the reexamination prosecution as invalid pursuant to 35 U.S.C. § 305 (impermissibly enlarging the scope of the claims being reexamined). Exh. 106.  SyncPoint did not file a timely response to the Final Office Action, i.e., prior to March 26.  Accordingly, its right to appeal the examiner's determination that all pending claims of the '214 patent are invalid has passed, and <u>all claims of the '214 patent asserted in the district court litigation are now deemed invalid.</u>

        **2.**        **The Patent Trial and Appeal Board Has Held That All Asserted Claims of the '214 Patent Are Invalid Except Dependent Claim 5**

On June 8, 2015, PixArt file a Petition for Inter Partes Review of the '214 patent with the Patent Trial and Appeal Board ("PTAB") of the Patent Office, pursuant to the provisions of the America Invents Act.  The petition was granted and inter partes review instituted on December 16, 2015.  On December 14, 2016, the PTAB issued its Final Written Decision, holding that all asserted claims of the '214 patent, except dependent claim 5, are invalid under 35 U.S.C. § 102 (anticipation).[9]  Exh. 107.  The PTAB denied PixArt's Request for Rehearing with respect to claim 5.[10]  Even if SyncPoint could assert claim 5 (which has been held invalid in the reexamination), the rationale for the PTAB's decision also precludes infringement.

---

[9] The grounds for invalidation in the ex parte reexamination and in the inter partes review are different, essentially doubling down on the invalidity of the '214 patent.

[10] PixArt will appeal the PTAB's decision on claim 5 to the Federal Circuit Court of Appeals, but only if SyncPoint appeals the PTAB's Final Written Decision as to the other claims or appeals the reexamination invalidity determination by the Patent Office.  Any appeal by PixArt or by SyncPoint will likely take about two years to resolve.  Historically, there is less than a 20% chance that the decisions of the Patent Office and/or the PTAB will be reversed.  *See* http://www.cafc.uscourts.gov/sites/default/files/the-court/statistics/; http://www.aiablog.com/blog/cafc-appeals/.

### 3. The Patent Infringement Claim Is Off the Table as a Result of the Invalidation of the '214 Patent

All claims of the '214 patent stand invalid, doing away with any claim for patent infringement.  In the unlikely event that SyncPoint finds some way to appeal the dual invalidity findings and salvages at least one claim—PixArt cannot imagine that any such possibility exists—it will still face a panoply of invalidity defenses at trial.[11]   SyncPoint no longer can seek patent infringement damages.

### B. The Dispute Between SyncPoint and PixArt Will Likely Be Decided by Arbitration, Not by the District Court, Under a Breach of Contract Theory

SyncPoint has indicated that it believes it can prevail against PixArt under a breach of contract theory.  As set forth in the Sale Motion,

> SyncPoint reports that a recent ex parte re-examination of the '214 Patent by the U.S. Patent and Trademark Office resulted in a non-final office action finding all claims of the patent invalid, a result that would moot any patent infringement claims. SyncPoint asserts, however, that its claim for royalties would be unaffected. SyncPoint points to the provision of the License Agreement that although PixArt may terminate the Agreement if "a court . . . determines [the patent] is invalid or unenforceable," such termination does not "relieve or discharge [PixArt] from any duty, obligation, or liability that was accrued as of the date of the termination (including, without limitation, the obligation to indemnify or to pay any amounts owing as of the date of termination)" and asserts that PixArt owes royalties under the Agreement for "LICENSED PRODUCT[S]" based solely on whether the products "would infringe one or more claims of the LICENSED PATENTS" – an issue that SyncPoint claims is independent of invalidity. Accordingly, SyncPoint takes the position that regardless of the outcome of the reexamination of the '214 Patent, PixArt is liable for breach of contract and the payment of royalties.

Sale Motion at 8-9.  Any such continued action, however, will be decided by arbitration, not by the district court, pursuant to terms of the License Agreement.  Any perceived tactical advantage

---

[11] By way of example, since PixArt did not file the reexamination request, it is not estopped to raise those same grounds for invalidity that were raised and considered in the reexam.  Nor is PixArt precluded from raising at trial any grounds for invalidity not reviewed by the PTAB during the inter partes review (i.e., obviousness under 35 U.S.C. § 103, and indefiniteness of the claims under 35 U.S.C. § 112).

that SyncPoint thought it might gain by filing in the Eastern District of Texas, generally regarded as perhaps the most patent plaintiff-friendly court in the land, will be lost.

### 1. The License Agreement Has an Arbitration Clause That Mandates Arbitration of Any Dispute Over Royalties

The License Agreement, drafted by Debtor Karl Hansen, provides for arbitration of royalty disputes at Section 10 as follows:

> 10.1.1  Any dispute between [SyncPoint and PixArt] concerning the amount of royalties payable to AGENT under this AGREEMENT shall be submitted for binding arbitration in accordance with the provisions of this Section 10 and the then-applicable rules of the American Arbitration Association (the "Association").  Judgment upon the arbitration award may be entered in any court of competent jurisdiction.
>
> 10.1.2  The power of the arbitrators shall be limited to resolving the specific issues stated by determining the royalties COMPANY owes or should receive credit for, if any, under this AGREEMENT.  The power of the arbitrators shall not extend to any other matters.  All other disputes shall be subject to litigation in a court of competent jurisdiction."

Exh. 103 at 12.  In addition, the License Agreement includes a "survival" clause, providing that the "provision of this AGREEMENT relating to payment obligations, confidentiality, indemnification, remedies, and <u>arbitration</u> shall survive the expiration or termination of this Agreement."  *Id.* at 13 (emphasis added).  Pursuant to the arbitration clause, it will be up to the arbitrator(s), not the district court, to determine if there was a breach and what amount of royalties, if any, PixArt owes SyncPoint for sales to Nintendo.

On May 14, 2015, PixArt served SyncPoint's counsel with an arbitration demand.  On May 26, 2015, SyncPoint refused, disagreeing with PixArt's interpretation of both the arbitration and the survival provisions of the License Agreement.  On June 30, 2015, PixArt filed a Motion to Stay Pending Arbitration and a Motion to Compel Arbitration.[12]  On July 7, 2015, Magistrate

---

[12] The arbitration motions were filed under seal in the district court and therefore are not attached.  A summary of the substance of the motions and SyncPoint's opposition thereto are set forth in Exhibit 109, PixArt's Objections to and Motion to Reconsider Magistrate Judge Payne's

Judge Payne of the district court denied PixArt's motion to stay, concluding that a stay was not warranted under the then state of facts "[u]pon the weighing of competing interests and in the interest of maintaining an even balance."  Exh. 108 at 3.  However, the court denied the motion without prejudice to PixArt's right to urge severance of the issue of damages at the pretrial stage "in light of the Agreement's clause relating to assessment of royalties owed in this dispute."  *Id.*

On July 21, 2015, PixArt filed Objections to and Motion to Reconsider Magistrate Judge Payne's July 7, 2015 Order Denying PixArt's Motion to Stay Proceedings Pending Arbitration. Exh. 109.  In its motion for reconsideration, PixArt pointed out that the magistrate judge failed to apply the Federal Arbitration Act and incorrectly relied upon the court's inherent authority to deny PixArt's motion.  *Id.* at 2.  The motion for reconsideration was taken up by Magistrate Judge Payne on October 30, 2015 during the court's claim construction hearing.  Although no decision was entered, the court suggested that royalties due during the period of the License Agreement may be separately decided by arbitration. Exh. 110 (Markman Hearing Tr. at 95-106).[13]

---

July 7, 2015 Order Denying PixArt's Motion to Stay Proceedings Pending Arbitration.

[13] In a docket-clearing general order, all pending motions in the district court litigation were dismissed without prejudice by Magistrate Judge Payne on February 27, 2017 in view of the stay pending determination of ownership of the patent, subject to re-urging if/when the district court stay is lifted.  If SyncPoint moves to lift the current stay, PixArt will re-file it motion to compel arbitration.  While it appears that Magistrate Judge Payne recognized that his initial denial of the motion to stay was in error and has in mind to grant the motion and let the parties arbitrate the contract dispute, PixArt is prepared to immediately appeal denial of its motions to stay and compel arbitration if the motions are denied.  Pursuant to Section 16(a) of the Federal Arbitration Act, interlocutory appeal may be taken from an order denying a motion to compel arbitration or for a stay pending arbitration.

2.     **Federal Law and Controlling Case Law Requires Arbitration of the Contract Dispute in Light of the Arbitration Clause**

There can be little doubt that the contract dispute must be arbitrated, notwithstanding SyncPoint's argument to the district court that the arbitration clause only applies to an accounting of royalties owed, not to whether the royalties are owed.  The Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, controlling case law, and the strong federal policy favoring arbitration all dictate that the entirety of the contract dispute must be arbitrated.  "Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. . ." *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25 (1983).  *See also Petrofac Inc. v. DynMcDermott Petroleum Operations. Co.*, 687 F.3d 671, 675 (5th Cir. 2012) (under Fifth Circuit law, when the AAA rules are incorporated into the parties' agreement, there is a "clear and unmistakable" intent to arbitrate arbitrability).

SyncPoint's breach of contract claim alleges that PixArt failed to pay royalties owed under the License Agreement. Exh. 102 at ¶ 55.  The manner in which royalties are determined under the License Agreement requires a resolution of the infringement claims. The License Agreement defines "LICENSED PRODUCTS" as CMOS products that, absent the license, would infringe one or more claims of the LICENSED PATENTS, which includes the '214 patent asserted in the district court litigation.  Thus, to determine if royalties are owed, the arbitrator(s) will have to conduct an infringement analysis, comparing the claims of the '214 patent with the Nintendo Wii system (including the PixArt CMOS sensor).

Clearly the arbitration clause is susceptible of an interpretation that covers the entirety of SyncPoint's claims against PixArt.  Unless the district court can hold "with positive assurance" that the arbitration clause "is not susceptible of an interpretation that covers the asserted dispute," it is required to stay the litigation. *See* 9 U.S.C. § 3; *AT&T Techs. Inc. v.*

*Commc'ns Workers of Am.,* 475 U.S. 643, 650 (1986); *Moses H. Cone*, 460 U.S. at 24; *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

> **3.**    **Whether PixArt's Sales to Nintendo Are Licensed Products for Which Royalties Must be Paid, and the Amount of Royalties, If Any, Will be Decided by the Arbitrator(s)**

The License Agreement provides that royalties are due on "LICENSED PRODUCTS," defined as any product or part thereof containing a CMOS sensor and software/firmware/hardware essential for function of product or part, that absent the granted license would infringe one or more claims of the "LICENSED PATENTS," which include the '214 patent, in countries where the licensor held patents.  PixArt timely paid its license fees, but only paid the minimum amount due because, as PixArt's hearing witness will testify, it concluded that its sales to Nintendo were not reportable sales.  PixArt initially sought a license to the '214 patent because a potential customer was contemplating the design and manufacture of a computer presentation system in which a user would control the computer with an external pointer, i.e., the system claimed in the '214 patent, and the potential customer asked PixArt to obtain a license to the technology.  *Id.*; Exhs. 111, 112.  However, that project was never commercialized, and as PixArt's hearing witness will also testify, PixArt decided against renewing the License Agreement when it expired in September 2012 because no significant use of its CMOS sensors covered by the '214 patent ever developed.

SyncPoint contends that the Nintendo Wii gaming system—which includes a remote that utilizes a PixArt CMOS sensor—infringes multiple claims of the '214 patent, that PixArt's sales of CMOS sensors to Nintendo were therefore reportable under the terms of the License Agreement, and that by failing to report such sales, PixArt has breached the Agreement.  Whether the sales to Nintendo were reportable requires that the arbitrator(s) first

determine whether there is infringement.   Then, if infringement is found, the arbitrator(s) must determine the amount of damages to which SyncPoint is legally entitled.[14]

###   C.   The Likelihood of An Arbitration Decision Finding Infringement is Extremely Small

Determining whether a patent claim is infringed is a two-step process.  The first step is determining what the claim means, a legal question decided by the court, usually pursuant to a formal claim construction procedure (including a claim construction hearing).  After the claim terms have been construed by the court, the next step is to determine if the claim describes the accused product or process.  This is a question of fact.  How the claims are construed is often determinative of the outcome of the case.  The district court construed the claims prior to staying the litigation, and presumably the arbitrator(s) will apply those constructions.

As construed by the district court, no claims of the '214 patent are infringed, in particular based on the court's definition of "external cursor" and the related term "optical cursor", one or the other being an element of all the asserted claims.   The '214 patent requires a visible external cursor projected onto a display.

The accused system is the Nintendo Wii, which includes a console, a sensor bar that is connected to and powered by the console, and a remote control—the Wii remote—that incorporates a PixArt CMOS sensor chip that serves as a camera.  The sensor bar, which is placed either above or below the television or display monitor, includes two groups of infrared LED's at either end, which are invisible.  Unlike the system claimed in the '214

---

[14] PixArt will seek the appointment of an arbitrator (or panel of arbitrators) having relevant technical expertise, effectively eliminating any plaintiff-bias SyncPoint might have hoped for by filing its infringement action in the Eastern District of Texas.

patent, the Wii thus works with invisible light projected away from the display.  The PixArt

CMOS chip in the Wii remote is only a sensor; it does not generate an external cursor, unlike

the pointer described in the '214 patent.  Thus, the Nintendo Wii system does not infringe,

and the CMOS sensors sold by PixArt to Nintendo are not within the scope of the License

Agreement.

> **D.     Even If PixArt's Sales to Nintendo Should Have Been Reported, SyncPoint Is Barred From Recovery by the Statute of Limitations, Or At Most May Recover No More Than Nine Months of Sales**

Assuming arguendo that the Nintendo Wii gaming system does infringe at least one

claim of the '214 patent and the CMOS sensors sold by PixArt fall within the definition of

LICENSED PRODUCTS covered by the License Agreement and should have been reported,

the potential damages are barred or at least limited by the applicable Statute of Limitations.

If the court or arbitrator(s) concludes that the License Agreement is an installment contract,

the damages are limited to no more than the period from January 1, 2012 through September

30, 2012, and to those sales covered by within the PROTECTED COUNTRIES.  Royalties

on those sales would be no more than $257,401.

> **1.     The Relevant License Payment Terms**

The TERM of the License Agreement was July 1, 2008 through September 30, 2012

and consisted of 4 REPORTING YEARS, further broken down into REPORTING PERIODS

comprising consecutive three month blocks.   The first REPORTING YEAR was five

quarters, from July 1 through September 30.  The second through fourth reporting years were

four quarters each, from October 1 through September 30.  Reporting blocks (i.e., the times

specified for reporting covered sales) ended September 30, December 31, March 31, and

June 30 of REPORTING YEARS.  Exh. 103.  PixArt's royalty reports during the License

Agreement are shown in Exh. 121.

Royalties were due on "LICENSED PRODUCTS," defined as any product or part thereof containing a CMOS sensor and software/firmware/ hardware essential for function of product or part, that absent the granted license would infringe one or more claims of the "LICENSED PATENTS" (including the '214 patent) in PROTECTED COUNTRIES, i.e., countries and/or territories covered by LICENSED PATENTS.  *Id.*

The License Agreement set relevant royalty rates per REPORTING YEAR as follows: 0-180,000 units @ USD50,000 flat rate; 180,001-1,000,000 units @ 10 cents/unit; 1,000,001-5,000,000 units @ 9 cents/unit; and >5,000,000 units @ 8 cents/unit.  *Id.*

A $50,000 royalty payment was to be made within 7 days of the beginning of each REPORTING YEAR, and additional royalty payments within 30 days of the end of a given REPORTING PERIOD.  *Id.*

### 2.    Choice of Law

Pursuant to paragraph 12.8 of the License Agreement, the parties agreed that the "AGREEMENT shall be construed, governed, interpreted, and applied in accordance with the laws of the State of New Hampshire (United States of America)."  *Id.*

### 3.    The Applicable Statute of Limitations

The New Hampshire Statute of Limitations applicable to actions for breach of written contract is three years.  RSA § 508:4.  *See also, A& B Lumber Co., LLC v. Vrusho*, 871 A.2d 64 (N.H. 2005).[15]  Under New Hampshire law, a cause of action for breach of contract

---

[15] RSA § 508:4(I) provides that if the breach was "not discovered and could not reasonably have been discovered at the time of the act or omission, the action [may] be commenced within 3 years of the time the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its causal relationship to the act or omission complained of."  *See also Gage v. State of New Hampshire*, 2014 WL 11656372 (Jan. 29, 2014).  However, as discussed

accrues "when the breach occurs whether any damage then occurred or not." *Rochester Lincoln-Mercury, Inc. v. Ford Motor Co.*, 2000 WL 1499471, at *2 (D.N.H. 2000) ("cause of action accrues when the breach occurs whether any damage then occurred or not") (internal quotation omitted); *A & B Lumber Co., LLC v. Vrusho*, 151 N.H. 754 (2005) ("contract claim must be brought within three years of the contract's breach").

### 4.  The Statute of Limitations Precludes All Damages, But At Least for Sales Prior to January 2012

Hansen knew as early as 2007, well before he entered into the License Agreement, that a PixArt CMOS sensor was used in the Wii remote, and he believed that the Nintendo Wii system infringed at least one claim of the '214 patent.  Notwithstanding that knowledge, he (and SyncPoint) waited until February 20, 2015 to file a complaint against PixArt alleging breach of contract.

Karl Hansen sent an email to Nintendo on November 28, 2007 based on his belief that the Nintendo system incorporating the PixArt CMOS sensor infringed the '214 patent.  Exh. 113.  His deposition is replete with statements confirming that he "firmly believed" that the Nintendo Wii infringed even before he signed the License Agreement with PixArt in 2008, including the following:

> Q:  And so as soon as—as soon as you saw that PixArt wasn't reporting sales or covering sales of its CMOS sensor to Nintendo, you knew right then and there that you had a claim that you could bring against Nintendo.  Right?  . . .  Because those sales weren't covered by the license agreement, correct?
> A:  I have been pretty obvious in all of my communications that I believed from the get-go when I found out that that it was Nintendo that Nintendo needed to be covered, and yes, that I had potential cause of action.  But my experience with the legal field told me that in order to do this I need a boatload of money.

---

below, that exception to the general rule is inapplicable to the present circumstances since the Licensor, Karl Hansen, admittedly was aware that the Nintendo Wii system infringed the '214 patent, thus rendering sales by PixArt to Nintendo reportable sales pursuant to the License Agreement.

Q: Okay. When did you think that you had that potential cause of action?

A: Every time that I told PixArt, you really should cover the Wii.

Q: So from 2007?

A: That would be—yeah, when I got the confirmation that this is PixArt, I Googled, said, oh, they've got this business deal. Oh, Kevin contacted me right after they announced this big deal; I bet Nintendo has ordered PixArt to go cover their bases.

Q: And then from right then and there you knew you had a cause of action against Nintendo, correct?

A: "Cause of action" is a legal term. Right then and there I thought that this product was probably infringing. (Dkt. No. 54, Exh. B, Hansen Tr. 463:20-465:8)[16]

Because Karl Hansen was aware of the purported infringement as early as 2007, but SyncPoint delayed filing its breach of contract claim until February 20, 2015, SyncPoint is barred by the statute of limitations from recouping any damages.[17]

>   **5.      SyncPoint Is Barred by the Statute of Limitations from Recovering Any Damages Unless the Contract is Deemed an Installment Contract, in Which Case the Total Royalties Recoverable Will Not Exceed $257,401**

As shown in Exh. 121, PixArt submitted its first royalty calculation report on or about October 13, 2008, covering the sales period July 1, 2008 through September 30, 2008. That report showed less than 50 units sold for the REPORTING PERIOD, and clearly did not include any sales to Nintendo for the Wii system. (All subsequent royalty calculation reports likewise showed di minimis sales. *Id.*) Because Hansen had already concluded by that time

---

[16] In this Amended Pretrial Memorandum, PixArt has removed the formerly redacted passages from Hansen's testimony, the use of which is pending before the district court. SyncPoint has objected to the use of such similar testimony by Hansen on the ground that it is covered by the district court's Protective Order, demonstrating its intent to conceal the fraud that Hansen perpetrated upon this Court. The testimony cited above was taken from the deposition transcript of Hansen's deposition taken on October 20, 2015, which was redacted and provided to the Trustee by stipulation of the parties in the district court litigation. It is part of this Court's record and can be found at Docket No. 54, Exhibit B.

[17] Because of Hansen's knowledge of purported infringement, the discovery rule recognized in New Hampshire under some circumstances does not apply.

that PixArt was selling its CMOS sensing devices to Nintendo for use in the Wii, and that the Nintendo Wii infringed the '214 patent, Hansen's breach of contract action against PixArt accrued as of October 14, 2008, and the three year statute of limitations period expired on October 14, 2011.  Because the Complaint was not filed until February 20, 2012, Hansen and SyncPoint are precluded as a matter of law from recovering any damages for the purported breach.

SyncPoint may try to argue that the License Agreement is a form of installment contract whereby "the statute of limitations runs only against each installment as it becomes due." *Gage v. State*, 2014 WL 11656372, * (N.H. S. Ct January 29, 2014) (quoting *General Theraphysical, Inc. v. Dupuis*, 118 N.H. 277, 279 (1978)).  However, the License Agreement is not analogous to the contracts discussed in installment contract cases, in particular those involving lease agreements.  The installment contract rule does not apply to a claim based on a single event or decision with effects continuing over time, as here.  *See McNamara v. City of Nashua*, 629 F.3d 92, 96 (1st Cir. 2011) ("installment contract rule" does not apply to claim based on single event with effects continuing over time; thus, it did not apply to claim against city for misreporting information to the New Hampshire Retirement System).

Here, the installment rule should not apply because it was determined by PixArt, at least by October 14, 2008, that the license agreement did not cover its sales to Nintendo for use in the Wii device.  Upon receiving the October 14, 2008 report, Hansen clearly understood that PixArt had made a determination that sales to Nintendo would not be included as part of the license agreement.  Indeed, such a determination would not change for the remainder of the TERM.  PixArt's decision not to include sales to Nintendo is not the same as individual acts under the installment rule, but rather of the ongoing effect of a one-

time determination.  *See Ariadne Financial Services Pty. Ltd. V. United States*, 133 F.3d 874, 879 (Fed. Cir. 1998); cf. *Russell v. Board of Trustees of Firemen, Policemen and Fire Alarm Operators' Pension Fund of Dallas, Tex.*, 968 F.2d 489, 493 (5th Cir. 1992) (continuing claim doctrine inapplicable if "original ... act ha[d] the degree of permanence that should trigger the claimant's awareness of and duty to assert her rights").

For sake of argument, if the License Agreement is somehow considered an installment agreement for which the breach recurs for each REPORTING PERIOD, SyncPoint can recover damages only for any breach that occurred on or after February 20, 2012.  For the period January 1, 2012 through September 30, 2012, PixArt sold in excess of 5 million units to Nintendo.[18]  Sales were made outside the United States, and the units were delivered to Nintendo outside the United States.  Based on the agreed royalty rates, if all such units were LICENSED PRODUCTS, according to SyncPoint's expert, Licensor would have been entitled to a maximum payment of $429,003.  However, a substantial percentage of those units—40%—were used in Nintendo Wii systems outside the PROTECTED COUNTRIES and/or not covered by a LICENSED PATENT, and therefore not subject to royalty.[19]  Exh. 116.  Therefore, the <u>maximum</u> royalties to which SyncPoint would be

---

[18] Conservatively, for purposes of this motion only, PixArt has included CMOS sensors shipped in January and February, 2012, because the royalty report for such sales/shipments was made in April, 2012, which is within the three year statute of limitations. Exh. 121 The sales numbers were taken from the expert report submitted in the district court litigation by SyncPoint's damages expert.  The exact number of sales is confidential to PixArt but has been disclosed to SyncPoint during the litigation, and is set forth in the report of SyncPoint's damages expert. Exh. 122.

[19] As shown in Exh. 116, for the time periods January 1, 2012 through September 30, 2012, 175.3 million units of the Nintendo Wii were shipped to Japan and the United States, out of total worldwide sales of 289.6 million units, or 60%.  As shown in Exh. 117, Canadian patent CA2378154 issued on September 18, 2012, thus was effective for only 12 days during the TERM and thus sales can be discarded as de minimis.  As shown in Exh. 118, European patent

entitled is $257,401.

The License Agreement also provides that, subject to limits imposed by law, interest shall accrue on payments made after the due date at the per annum rate of 18 percent, compounded daily, from the respective due date until paid.  SyncPoint's expert calculated the interest due as of December 17, 2015 on sales made during the period January 1 through September 30, 2012 to be $341,709.  Reducing that amount for sales outside the PROTECTED COMPANIES by 40%, SyncPoint might claim $205,025 in interest.  However, PixArt will seek to reduce or cancel the interest based on equitable estoppel— PixArt should not be required to pay the usurious interest in view of SyncPoint's delay in filing its claim any more than it can be required to pay for sales outside the statute of limitations period.  Thus, the total potential recovery, based on a 40% reduction of the damages calculation by SyncPoint's expert, would be $462,426.

Finally, the Court must take into consideration the fact that before the Trustee and the bankruptcy estate would receive any money, SyncPoint's counsel will take at least its litigation costs from the recovery, plus its contingent fee.  Assuming costs of $250,000 to date and that SyncPoint's counsel has a 60% contingency, the Trustee and bankruptcy estate might recover $84,970—but only if the License Agreement is considered an installment contract.  This is approximately half of what PixArt has offered—and PixArt's offer is risk-

---

EP1200955, while in effect during the TERM, claimed projecting/superimposing a plurality of fiducials on the screen for detecting the position of the external cursor.  The Nintendo Wii system does not do this, and SyncPoint did not assert similar claims in the '214 patent. Therefore sales in France and Great Britain are not LICENSED PRODUCTS.  Likewise, as shown in Exh. 119, German patent No. DE60023900 also claimed projecting/superimposing a plurality of fiducials on the screen for detecting the position of the external cursor, and therefore sales of the Nintendo Wii in Germany are not LICENSED PRODUCTS.  As shown in Exh. 120, Australian patent application AU20057549 did not enter National Phase and therefore never became a LICENSED PATENT.

free.  If SyncPoint's counsel's costs exceed $250,000, the potential recovery by the Trustee and bankruptcy estate would be even less.[20]

### E.    Other Defenses Will Likely Preclude Any Recovery by SyncPoint

Whether SyncPoint's claim for breach of contract is tried by the district court or is arbitrated, additional defenses will preclude recovery.

#### 1.    Judicial Estoppel

Karl Hansen's statements to this Court in his debtor's disclosure (Exh. 104) and at the debtor's hearing in 2012 (Exh. 105) that the patents had no value and that PixArt had not breached the License Agreement and that he did not have a claim against anyone for anything estop SyncPoint from claiming damages.  *See Brandon v. Interfirst Corp.*, 858 F.2d 266 (5th Cir. 1988) ("Judicial estoppel is a common law doctrine by which a party who has assumed one position in his pleadings may be estopped from assuming an inconsistent position."); *In re Costal Plains, Inc.*, 179 F.3d 197, 208-209 (5th Cir. 1999) (a party who failed to disclose a claim in bankruptcy proceedings is judicially estopped from asserting that claim after emerging from bankruptcy).

#### 2.    Personal Jurisdiction

PixArt filed a motion to dismiss SyncPoint's claim on the grounds that the district court lacks jurisdiction over it.  *See AFTG-TG v. Nuvoton Tech. Corp.*, 689 F.3d 1358, 1360 (Fed. Cir. 2012) (defendant must purposely direct activities into the forum); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011) (specific jurisdiction "is confined to adjudication of issues deriving from, or connected with, the very controversy

---

[20] PixArt will update these estimates for trial once it receives information from SyncPoint regarding attorneys fees and costs.

that establishes jurisdiction."). PixArt sells and delivers its CMOS sensors to Nintendo outside the United States and has no control over Nintendo's use and importation of those sensors into the United States. PixArt's motion was not addressed on the merits prior to the stay. Assuming that SyncPoint's patent infringement claims are now moot in view of the invalidity of the '214 patent, the district court will no longer have jurisdiction over the breach of contract claim, which was before the district court as a pendent claim, and PixArt will renew its motion if/when the stay is lifted.

### 3. SyncPoint Lacks Standing to Sue for Infringement or Breach of Contract

PixArt will assert and demonstrate that SyncPoint does not have standing to sue for infringement or for breach of contract. At the time SyncPoint filed the Complaint, the '214 patent had not been assigned to SyncPoint. Discovery is continuing, but it appears that SyncPoint and its counsel engaged in fraudulent post-filing creation of patent assignment documents to cover up SyncPoint's failure to properly obtain an assignment of the patents from Karl Hansen prior to filing the Complaint. Because SyncPoint did not own the '214 patent at the time the Complaint was filed, it lacks standing and its claims must be dismissed. *See Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359 (Fed. Cir. 2010) (plaintiff lacked standing to sue where assignment occurred after filing complaint); *Gaia Technologies, Inc. v. Reconversion Technologies, Inc.*, 93 F.3d 774, 780 (Fed. Cir. 1996) (reversing denial of motion to dismiss infringement complaint and vacating verdict that the asserted patents were infringed because alleged *nunc pro tunc* agreement was insufficient to cure the lack of standing existing when the complaint was filed); *Keene Corp. v. United States*, 508 U.S. 200, 207 (1993) (court may exercise jurisdiction only if a plaintiff has standing to sue on the date it files suit).

### III.    CONCLUSION

This Court's decision as to which offer best serves the bankruptcy estate should be an easy one.  PixArt has offered $150,000, payable within seven days of the Court's approval of the sale.  It is guaranteed money that will ensure the creditors are fully reimbursed, that the Trustee's administrative expenses will be paid, and that the Trustee's fees will be paid in whole or substantial part.

SyncPoint's proposal, on the other hand, is a bad bet.  Its infringement claim is gone. As for its breach of contract claim, SyncPoint can only recover if there is a finding of infringement, and the likelihood that it can prove infringement in light of the district court's claim construction is essentially zero, especially since the breach of contract claim will almost certainly be decided by a neutral, tech-savvy arbitrator/arbitration panel, not the plaintiff-friendly Eastern District of Texas. And, even if SyncPoint somehow convinces an arbitrator/arbitration panel that there is infringement, it is barred from recovery by the statute of limitations, or if the License Agreement is deemed an installment contract, the potential recoverable damages that are available for the creditors and the Trustee will fall far short of what PixArt has offered.

For these reasons, PixArt requests the Court approve the sale of the estate's Patent Assets to PixArt on the terms set forth in the Purchase and Sale Agreement.

Date:   April 6, 2017

/s/ Thomas K. McCraw, Jr.
Thomas K. McCraw, Jr. (BNH 06789)
thomas.mccraw@leclairryan.com
**LECLAIRRYAN LLP**
One International Place, Suite 1110
Boston, MA 02110
Telephone: 617-502-8211
Facsimile: 617.502.8261

Duane Mathiowetz (Pro Hac Vice)
duane.mathiowetz@leclairryan.com
Rick C. Chang (Pro Hac Vice)
rick.chang@leclairryan.com
**LECLAIRRYAN LLP**
44 Montgomery Street, Suite 3100
San Francisco, CA  94104
Telephone: 415.391.7111
Facsimile:  415.391.8766

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

In re:                                                    Chapter 7

KARL C. HANSEN AND LISA H. HANSEN,                       Case No. 12-11907-JMD

                                                          Hearing Date:  April 12, 2017
                                                          Hearing Time:  9:00 a.m.
                        Debtors.

## CERTIFICATE OF SERVICE

I, Thomas K. McCraw, Jr. hereby certify that a copy of the foregoing THIRD-PARTY PIXART IMAGING, INC.'S AMENDED PRETRIAL MEMORANDUM IN SUPPORT OF TRUSTEE'S SALE OF ASSETS TO PIXART IMAGING and supporting document have been sent this 6th day of April 2017, via the Court's ECF/electronic mail to Lisa Hansen, Karl Hansen and all other parties on the Court's Electronic Service List.

Date:   April 6, 2017                          /s/ *Thomas K. McCraw, Jr.*
                                                Thomas K. McCraw, Jr.