**2017 BNH 005**        Note:   This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:                                                                    Bk. No. 12-11907-JMD
                                                                          Chapter 7
Karl C. Hansen and
Lisa H. Hansen,
                    Debtors

*Daniel C. Cohn, Esq.*
*Murtha Cullina LLP*
*Boston, Massachusetts*
*Attorney for Chapter 7 Trustee*

*Thomas K. McCraw, Jr., Esq.*
*Duane Mathiowetz, Esq.*
*Rick C. Chang, Esq.*
*LeClairRyan LLP*
*Boston, Massachusetts and San Francisco, California*
*Attorneys for PixArt Imaging, Inc.*

*Joseph G. Pia, Esq.*
*Robert Aycock, Esq.*
*Pia Anderson Moss Hoyt*
*Salt Lake City, Utah*
*Attorneys for Debtors and SyncPoint Imaging, LLC*

## <u>MEMORANDUM OPINION</u>

## I.  INTRODUCTION

On March 22, 2017, Olga L. Gordon, the chapter 7 trustee for the above-captioned

bankruptcy case (the "Trustee"), filed a Motion for Sale or Other Disposition of Patent Assets

(Doc. No. 103) (the "Motion").  The Motion was filed pursuant to the terms of a Stipulation

Concerning Patent Rights (Doc. No. 99) (the "Stipulation"), which the Court approved on March

21, 2017 (Doc. No. 101).  Through the Motion, the Trustee seeks authority to sell to PixArt

Imaging, Inc. ("PixArt") certain patent assets[1] (the "Patent Assets") free and clear of all liens, encumbrances, or adverse interests, pursuant to the terms of a purchase and sale agreement dated January 21, 2016 (the "PixArt Offer"). In accordance with the terms of the Stipulation, SyncPoint Imaging LLC ("SyncPoint") made a counteroffer (the "SyncPoint Offer") to the PixArt Offer. The Court scheduled a hearing on the Motion for April 12, 2017, in order to consider the competing offers and to take evidence on the relevant issues.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 77.4(a) of the United States District Court for the District of New Hampshire. This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II. BACKGROUND

Debtor Karl Hansen owned various domestic and foreign patents, previously identified as the Patent Assets, on the date he filed chapter 7 bankruptcy on June 11, 2012. Prior to bankruptcy, the Debtor[2] had licensed the Patent Assets to PixArt pursuant to a non-exclusive license agreement dated on or about June 26, 2008 (the "License Agreement").[3] After the Debtor's bankruptcy case was closed on January 2, 2013, and before it was reopened on September 3, 2015, the Debtor conveyed the Patent Assets to SyncPoint, a Texas company that the Debtor controls. On February 20, 2015, SyncPoint brought suit against PixArt, Nintendo,

---

[1] The patents are US6275214B1 (referred to by the parties as the "214 Patent"), US6952198B2, US7091949B2, EP1200955B1, DE60023900T2, CA2378154C, JP2003504705A(JP4822643B2), and AU200057549A.

[2] The License Agreement was made between the Debtor and PixArt with Brilliant Points, Inc. ("Brilliant Points") acting as the Debtor's authorized agent with respect to licensing the Patent Assets. License Agreement at p. 3. The Debtor was Brilliant Point's president at the time the License Agreement was executed.

[3] In accordance with its terms, the License Agreement terminated on September 30, 2012. PixArt did not extend the license.

2

and others for patent infringement[4] and other causes of action in the United States District Court

for the Eastern District of Texas, Marshall Division (the "Texas Federal Court"), Case No. 2:15-

cv-247 (the "Patent Case").  PixArt denies liability in the Patent Case[5] and the Patent Case

remains pending.  SyncPoint asserts that the damages claimed in the Patent Case are contractual

in nature and to date exceed $28 million.  Once the bankruptcy case was reopened, a dispute

arose between the Trustee and the Debtor as to whether the Patent Assets, and any causes of

actions arising from ownership of the Patent Assets, were properly disclosed on the Debtor's

schedules and at the first meeting of creditors held on July 11, 2012.[6]  That dispute was resolved

by the Stipulation.  After the bankruptcy case was reopened, creditors were advised to file proofs

of claim.  Creditors filed claims totaling $19,316.69 with the Court.

## III.  COMPETING OFFERS

### A.  PixArt Offer

The PixArt Offer provides as follows:

1.      PixArt will pay the Trustee $150,000.00 for the Patent Assets.

---

[4]  Note, as the result of recent decisions by the Patent Office and the Patent Trial and Appeals Board, SyncPoint's claims that PixArt, Nintendo, and the other defendants infringed the 214 Patent are essentially worthless as those decisions have held that the "claims" of the 214 Patent are invalid.  A "claim" is a sentence at the end of a patent that defines, in technical terms, the scope of the legal protections conferred by the patent.  According to the parties, most patents have multiple claims.  The 214 Patent has twenty-six claims.  In patent infringement litigation, "patent infringement" refers to a cause of action alleging infringement of one or more patent claims.  However, the invalidity of the patent claims is not a defense to any contract claims arising under the License Agreement before the ruling on invalidity of such claims.

[5]  The parties report that no answer has yet been filed in the Patent Case.  Despite this, the Patent Case has proceeded with both fact and expert discovery.  The Patent Case was eventually stayed on January 7, 2016, at SyncPoint's request, pending disposition of the proceedings before this Court regarding ownership of the Patent Assets.

[6]  See 11 U.S.C. § 341.

3

2.  PixArt has paid a $50,000.00 deposit, which the Trustee is holding.  The deposit will be applied to the purchase price at the closing.  If, however, the Court were to approve another offer for the Patent Assets, PixArt would be entitled to the return of its deposit.

3.  The sale will be consummated within seven days of an order of the Court approving the PixArt Offer.  There are no conditions to consummation; the parties are required to close the sale even if an appeal from the sale order is pending.

4.  The sale is AS IS and WHERE IS, with a disclaimer of warranties as permitted by law.  From and after the closing, PixArt will indemnify the bankruptcy estate from any liability arising on account of post-closing events.

If a sale to PixArt were approved, the following would occur:

1.  Allowed prepetition claims would be paid in full as the Trustee has committed to subordinate that portion of her commission and counsel's fees and expenses as is necessary to assure that the allowed prepetition claims are paid in full.

2.  Administrative expenses would be paid nearly in full.[7]

3.  No money would be distributed to and no assets would revert to the Debtors.

4.  PixArt would move to dismiss the Patent Case.

**B.  SyncPoint Offer**

Pursuant to the SyncPoint Offer:

1.  SyncPoint would retain ownership of the Patent Assets.[8]

2.  SyncPoint would be permitted to litigate the Patent Case (including any related proceedings such appeals or arbitrations) to conclusion, whether through judgment or settlement.

---

[7]  As of March 22, 2017, Trustee's counsel's fees and expenses totaled approximately $130,000.00.  The trustee commission on $150,000.00 would be $10,700.00.  Thus, along with creditor claims of nearly $20,000.00, administrative and creditor claims total about $160,000.00 (not including further counsel's fees and expenses that would accrue through the date of the sale closing).

[8]  Pursuant to the Stipulation, if the Court approves a sale to PixArt, SyncPoint will transfer the Patent Assets to the Trustee.  Apparently, until that time, ownership of the Patent Assets remains with SyncPoint.

3.      Control of and decisions concerning the Patent Case and all other matters concerning the realization of value from the Patent Assets would be the sole purview of SyncPoint but SyncPoint would be required to provide a written report to the Trustee concerning any material event in the Patent Case, or otherwise concerning the Patent Assets, and whenever requested by the Trustee.

The following would occur if the SyncPoint Offer were approved:

1.      If there is no recovery in the Patent Case, neither the creditors nor the administrative expenses of the bankruptcy estate would be paid.  In addition, SyncPoint would not recover the $10,000.00 it has advanced for costs in the Patent Case.  SyncPoint's attorneys, Pia Anderson Moss Hoyt ("PAMH"), would not recover money it has advanced for costs or the fees it has incurred, which to date total approximately, $242,120.00 and more than $2 million, respectively.

2.      If there is a recovery in the Patent Case, the first funds would be paid to the Trustee to cover her fees and costs and the amounts owed to creditors, including interest at the federal judgment rate.

3.      If the recovery exceeds the amounts necessary to pay administrative and unsecured creditors of the bankruptcy estate, the recovery would be split pursuant to the terms of a contingency fee agreement between SyncPoint and PAMH.  That fee agreement provides that, first, SyncPoint would recover the $10,000.00 it has advanced for costs in the Patent Case and, then, PAMH would recover its costs.  PAMH would next recover its fees.  SyncPoint and PAMH would then split the remainder of the award 40% and 60%, respectively.[9]

## IV.  LEGAL STANDARDS

Motions to sell are governed by 11 U.S.C. § 363.  Section 363(b) provides that "[t]he

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

---

[9]  Pursuant to the Stipulation, any benefit to SyncPoint is to be considered a benefit to the Debtors.  Thus, under this scenario, the Debtors would receive funds, in essence a "surplus" in bankruptcy parlance.  It is this potential for a surplus that gives the Debtors standing to object to the Motion (Doc. No. 118).  See Licata v. Coan (In re Licata), 659 Fed. Appx. 704, 706 (2nd Cir. 2016) ("A Chapter 7 debtor has standing to object to a sale of the asset 'only if there could be surplus after all creditors' claims are paid.'  To establish standing, the Chapter 7 debtor has the burden of showing that there is at least a reasonable possibility of a surplus." (citations omitted)); see also Spenlinhauer v. O'Donnell, 261 F.3d 113, 119 (1st Cir. 2001); Kowal v. Malkemus (In re Thompson), 965 F.2d 1136, 1143 n.12 (1st Cir. 1992); In re Matthews, No. 10-96519-MGD, 2014 WL 1277874, at *3 (Bankr. D. N.D. Ga. Mar. 11, 2014) ("Courts generally agree that a debtor has no standing to object to the manner in which the trustee administers the bankruptcy estate, except in a case where a surplus is in prospect.").

business, property of the estate." 11 U.S.C. § 363(b)(1). A trustee should be authorized to conduct a sale "if the decision is supported by 'reasonable,' 'proper' or 'sound' business judgment, a rule commonly referred to as the 'business judgment test.'" In re SW Boston Hotel Venture, LLC, No. 10-14535-JNF, 2010 WL 3396863, at *3 (Bankr. D. Mass. Aug. 27, 2010) (cited in In re Genesys Research Institute, Inc., No. 15-12794-JNF, 2016 WL 3583229, at *18 (Bankr. D. Mass. June 24, 2016)). A trustee's business decision should be approved by the Court unless it is shown "to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice." White v. Official Committee of Unsecured Creditors (In re Cadkey Corp.), 317 B.R. 19, 22 (Bankr. D. Mass. 2004) (quoting In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001)).

While the Trustee has filed a "motion to sell" the Patent Assets to PixArt, such a sale is, in effect, a settlement of the Patent Case. Thus, in addition to considering the "business judgment test" in ruling on the Motion, the Court will also consider the standards applicable to approving a settlement under Federal Rule of Bankruptcy Procedure 9019.

In determining whether to approve a compromise of a claim, bankruptcy courts must "assess and balance the value of the claim that is being compromised against the value to the estate of acceptance of the compromise proposal." In re GHR Cos. Inc.., 50 B.R. 925, 931 (Bankr. D. Mass. 1985) (quoted in Jeffrey v. Desmond, 70 F.3d 183, 185 (1st Cir. 1995)); see also Hicks, Muse & Co., Inc. v. Brandt (In re Healthco Int'l, Inc.), 136 F.3d 45, 50 (1st Cir. 1998).

> The specific factors which a bankruptcy court considers when making this determination include:
>
> (i)    the probability of success in the litigation being compromised;
> (ii)   the difficulties, if any, to be encountered in the matter of collection;

6

> (iii)    the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and
>
> (iv)    the paramount interest of the creditors and a proper deference to their reasonable views in the premise.

Jeffrey, 70 F.3d at 185 (citing In re Anolik, 107 B.R. 426, 429 (D. Mass. 1989)).  In addition, the Court may consider "the experience and competence of the fiduciary proposing the settlement." Healthco, 136 F.3d at 50.  "In determining the value of the claim and the proposed settlement, 'the [bankruptcy judge] . . . is not to substitute her judgment for that of the trustee, and the trustee's judgment is to be accorded some deference.'"  C.R. Stone Concrete Contractors, Inc. v. Anderson (In re C.R. Stone Concrete Contractors, Inc.), 346 B.R. 32, 49 (Bankr. D. Mass. 2006) (quoting Healthco, 136 F.3d at 50).  "Important to understanding the court's role is the black letter proposition that '[c]ompromises are favored in bankruptcy.'"  Healthco, 136 F.3d at 50 n.5.

The First Circuit has noted that "many, if not most, claims settled in bankruptcy proceedings are not amenable either to ready or exact valuation in the abstract."  Id. at 51 (citations omitted).  Thus, it is not a bankruptcy court's responsibility "to decide the numerous questions of law and facts raised by [the parties] but rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'"  Id. (quoting Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983)).

## V.  DISCUSSION

### A.  Trustee's Competence and Experience/Deference to Her Business Judgment

The Trustee is an experienced bankruptcy trustee.  Between her and her counsel, they have more than fifty years experience handling bankruptcy matters.  No one at the hearing challenged her competence or experience.

As the Trustee has explained, she has a duty pursuant to 11 U.S.C. § 704(a) to "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interest of parties in interest."  The Trustee received two competing offers with respect to the Patent Assets.  Thus, the Trustee was faced with deciding which offer was in the best interest of the parties in interest (i.e., the creditors and the Debtor): (1) the cash offer from PixArt, which would pay creditors in full but leave nothing for the Debtor, or (2) the contingent offer from SyncPoint, where recovery by the creditors and any surplus to the Debtors[10] depends upon SyncPoint's success in the Patent Case litigation.

In order to reach a decision as to which offer for the Patent Assets was better, in the Trustee's business judgment, the Trustee posed numerous questions to both PixArt and SyncPoint in attempt to further understand the strengths and weaknesses of the Patent Case; her counsel reported at the hearing that both sides were cooperative and forthcoming in their responses.  She reviewed various materials and consulted with her own firm's intellectual property attorneys.  She also considered the testimony and exhibits presented at the evidentiary

---

[10]  SyncPoint notes in its supplemental brief that the Trustee has a fiduciary duty, not only to the creditors, but to the Debtors as well.  The Handbook for Chapter 7 Trustees provides:

> The trustee is a fiduciary charged with protecting the interests of all estate beneficiaries - namely, all classes of creditors, including those holding secured, administrative, priority, and non-priority unsecured claims, as well as the debtor's interest in exemptions and in any possible surplus property.  The trustee should administer the estate so as to maximize the distribution to the beneficiaries.  To represent the estate, the trustee must secure for the estate all assets properly obtainable under applicable provisions of the Bankruptcy Code, object to the debtor's discharge where appropriate, defend the estate against improper claims or other adverse interests, and must liquidate the estate as expeditiously as possible for distribution to creditors.

U.S. Dep't of Justice, Executive Office for the United States Trustee, Handbook for Chapter 7 Trustees c. 6, § A (effective October 1, 1998), https://www.justice.gov/ust/handbook-chapter-7-trustees (last visited April 14, 2017) (emphasis added).  See Wisdom v. Gugino, 649 Fed. Appx. 583, 584 (9th Cir. 2016) ("When a debtor retains an interest in estate assets–either by properly claiming exemptions or because surplus property will remain in the estate after all creditors have been compensated–the trustee owes a fiduciary duty to the debtor as well.").

hearing on the Motion.  In the end, she decided that she could not recommend the SyncPoint

Offer and that, instead, she determined that PixArt's "bird in the hand" offer was in the best

interests of the parties in interest in this case.

> The First Circuit Court of Appeals has advised:

> When augmentation of an asset involves protected investigation or potentially
> costly litigation, with no guarantee as to the outcome, the trustee must tread
> cautiously–and an inquiring court must accord him wide latitude should he
> conclude that the game is not worth the candle.  After all, "a chapter 7 trustee is
> required to reach an informed judgment, after diligent investigation, as to whether
> it would be prudent to eliminate the inherent risks, delays and expense of
> prolonged litigation in an uncertain cause."

LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 212 F.3d 632, 634 (1st Cir.),

cert. denied, 531 U.S. 960 (2000) (emphasis added) (quoted in Beaulac v. Tomsic (In re

Beaulac), 294 B.R. 815, 819 (B.A.P. 1st Cir. 2003)).

Based on the evidence and arguments at the hearing, the only difference in benefit to the

creditors under the SyncPoint Offer is the payment of interest at the federal judgment rate, if a

recovery is realized.  Such a benefit merely reflects the time value of any delay in payment.  The

price for that benefit is an unknown time delay and the risk of no recovery.  The benefit to the

Debtor under the SyncPoint Offer is the opportunity to receive any surplus from a recovery

against PixArt.  The price of that benefit is a reduction off of the top of any recovery, and any

resulting surplus, of approximately $200,000.00 paid to the estate.  In the absence of any

recovery, the only cost to the Debtor is the further investment of his time.  The benefit of the

PixArt Offer to the creditors is payment of all claims in full immediately.  The detriment to the

Debtor is the loss of any opportunity to recover a surplus.

As will be explained below, the Court finds the Trustee's decision reasonable, given the

legal standards and the facts of this case.  The Court believes that the Trustee's decision to sell

the Patent Assets to PixArt is based upon sound business judgment and not on any bad faith, whim, or caprice.  For those reasons, the Court will defer to the Trustee's business judgment. The Court will further consider whether the PixArt Offer satisfies the <u>Jeffrey</u> factors as the Motion could be characterized as a motion to compromise the estate's interest in SyncPoint's claims against PixArt.

### B.  Probability of Success

In considering the probability of success, the Court should consider legal and evidentiary obstacles of litigating the claim.  <u>Healthco</u>, 136 F.3d at 50.  In addition, the Court should measure the probability of success "against the more definitive, concrete and immediate benefits attending the proposed settlement."  <u>Id.</u>  In considering the probability of success in the Patent Case, the Court is not required to decide the merits of the Patent Case; rather, the Court's assessment is limited to considering the probability that SyncPoint would succeed on its claims. <u>See</u> <u>Matthews</u>, 2014 WL 1277874, at *4.

### 1.  Patent Case Description

The Debtor and PixArt entered into the License Agreement in June 2008 pursuant to which the Debtor granted to PixArt "a personal nonexclusive, nontransferable, limited license" to the Patent Assets, including the 214 Patent.  The term of the License Agreement was from July 1, 2008, to September 30, 2012, a period of four years and three months.  The License Agreement required PixArt to pay royalties according to a tiered schedule and based upon the number of CMOS sensors that PixArt sold.  Under the tiered schedule, PixArt was required to pay a minimum annual royalty of $50,000.00 if annual sales of CMOS sensors were less than 180,000 units.  If PixArt sold more than 180,000 sensors per year, PixArt was required to pay additional royalties according to the tiered schedule.  Throughout the term of the License

10

Agreement, PixArt never paid more than the minimum royalty amount of $50,000.00 per year.
The Debtor never raised any claim with PixArt during the term of the License Agreement that
PixArt was required to pay additional royalties; the Debtor only asserted such a claim after the
License Agreement terminated on September 30, 2012.  Only in 2015, did SyncPoint, as current
holder of the Patent Assets, bring suit in Texas Federal Court alleging PixArt breached the
License Agreement by selling CMOS sensors to Nintendo for inclusion in Nintendo's Wii
gaming system (the "Wii") without paying the required royalty due under the License
Agreement.  SyncPoint contends that PixArt was required to pay an additional $28 million in
royalties for the sale of these CMOS sensors.

 According to the License Agreement, a "Licensed Product" for which royalties were due
means "any product or part thereof containing a CMOS sensor and software/firmware/hardware
essential for function of product or part" that, absent the License Agreement, "would infringe
one or more claims of the Licensed Patents . . . ."  License Agreement §§ 1.10 and 1.10.1.  The
parties agree that determination of what constitutes a royalty bearing "Licensed Product" under
the License Agreement collapses into a patent infringement analysis.  SyncPoint contends that
the Nintendo Wii incorporates PixArt's CMOS sensors and infringes at least claim 25 of the 214
Patent.  For that reason, SyncPoint argues that the Wii is a royalty bearing product under the
License Agreement.

 As the parties have explained, a determination of patent infringement is a two-step
process.  First, the scope of a patent's claims is ascertained; this is known as "claim
construction."  Second, a court determines whether the claimed invention has been infringed,
i.e., whether the claims are properly interpreted to cover the accused product.  The Texas Federal
Court has already issued a claim construction order that construes the relevant terms for the

claims of the 214 Patent.  The Texas Federal Court has not yet determined whether claim 25 of the 214 Patent has been infringed by PixArt's sale of CMOS sensors to Nintendo who incorporated those sensors into the Wii.

As previously noted in footnote 4, as a result of two separate decisions by the Patent Office, all claims of the 214 Patent currently stand as invalid.  Accordingly, PixArt contends that SyncPoint can no longer seek patent infringement damages against PixArt, Nintendo, and the other defendants in the Patent Case.  SyncPoint has conceded this point.  Nonetheless, even though all claims of the 214 Patent have been deemed invalid, the parties agree that SyncPoint can still pursue its claim against PixArt for breach of the License Agreement, as the subsequent finding of invalidity does not relieve PixArt's liability to pay any royalties that accrued during the license term and prior to the invalidity finding.

### 2.  Infringement

The parties disagree as to whether an arbitrator[11] will find infringement.  SyncPoint contends that claim 25 of Patent 214 covers Nintendo's Wii while PixArt argues it does not.  According to the 214 Patent, the object of the Debtor's invention was to remotely control a computer presentation "based on characteristics of an optical pointer used to superimpose a cursor or visual cue onto a projected image of a computer screen."  The computer's cursor is called an "internal cursor" because it is generated by the computer and a laser pointer's cursor is called an "external cursor" because it is generated by a device other than the computer, such as by a handheld laser pointer.

---

[11]  The License Agreement provides for arbitration of royalty disputes.  License Agreement § 10.1.  Although this was an issue in the Patent Case at one point, the parties now agree that the parties' royalty dispute will be resolved through binding arbitration.

According to PixArt, unlike the system claim in the 214 Patent, the Wii works with invisible infrared light projected away from the display and the CMOS chip in the Wii remote is only a sensor and does not generate an external cursor, unlike the pointer described in the 214 Patent.  For that reason, PixArt contends the Wii does not infringe and the CMOS sensors sold by PixArt to Nintendo are not within the scope of the License Agreement.

SyncPoint argues that the Wii is capable of operation using various types of visible external cursors as required by claim 25.  SyncPoint states that it is well know that the Wii is capable of using an external cursor that is visible to a user, e.g., lit candles, ordinary lights, flashlights, and even handheld laser pointers.  Thus, because the computer instructions for the Wii are capable of performing the functions cited in claim 25 using a visible external cursor, the Wii infringes claim 25.  For that reason, SyncPoint contends that PixArt was and is required to pay royalties on the CMOS sensors sold to Nintendo and incorporated into the Wii under the License Agreement.

In the Trustee's view, SyncPoint will have an uphill battle to establish that the light going from the screen toward the handheld CMOS sensor is a cursor within the meaning of claim 25 of Patent 214.  She does not think the Wii will be found to infringe claim 25.

As explained above, the Court need not decide the merits of the Patent Case but only the probability of success.  Thus, the Court is not required to express an opinion as to whether the Wii infringes Patent 214.  As the Court stated at the hearing, reasonable minds can differ on the success of SyncPoint's infringement argument.  Instead, the Court will focus on the defenses to SyncPoint's breach of contract claim.

### 3.  Defenses

At the hearing, PixArt indicated that it will raise the following defenses to SyncPoint's breach of contract claim: (a) lack of personal jurisdiction; (b) judicial estoppel; (c) lack of standing; (d) equitable estoppel; and (e) statute of limitations.  If successful, any one of these defenses may preclude a recovery by SyncPoint.  SyncPoint contends that PixArt would not be able to raise any of these defenses in an arbitration proceeding since the License Agreement provides that "[t]the power of the arbitrators shall be limited to resolving the specific issues stated by determining the royalties [PixArt] owes or should receive credit for, if any, under this AGREEMENT.  The power of the arbitrators shall not extend to any other matters."  License Agreement § 10.1.2.  The Court disagrees that PixArt will be unable to raise any defense to SyncPoint's entitlement to royalties in the Patent Case.  It is nonsensical that PixArt would be prohibited from raising any challenges to its claimed liability in the Patent Case.  As PixArt has pointed out, the License Agreement contains the following additional language:  "All other disputes shall be subject to litigation in a court of competent jurisdiction."  Id.  The Court does not believe the License Agreement precludes consideration of PixArt's defenses.  Such defenses will undoubtedly be raised by PixArt in the Patent Case and will be considered by the arbitrator or the Texas Federal Court.

### a.  Lack of Personal Jurisdiction

PixArt has already filed a motion in the Patent Case to dismiss SyncPoint's claim on the grounds that the Texas Federal Court lacks jurisdiction over it.  The Texas Federal Court did not rule on the motion before it issued its stay of the Patent Case, and PixArt indicates it will renew that motion if/when the stay is lifted.  PixArt states that it sells and delivers its CMOS sensors to Nintendo outside of the United States and has no control over Nintendo's use and importation of

14

those sensors into the United States.  According to PixArt, the Texas Federal Court has no

personal jurisdiction over it as it has not purposely directed activities in the forum.  Without

deciding the merits of this defense, it is clear that if the Patent Case continues, PixArt will pursue

it.

### b.  Judicial Estoppel

PixArt also contends that SyncPoint should be judicially estopped from pursuing its

breach of contract claim based on the statements of its principal, the Debtor, in the bankruptcy

proceedings.  When the Debtor filed for bankruptcy in June 2012, the Debtor did not list the

Patent Assets under the "Patents, copyrights, and other intellectual property" category in

Schedule B.  Instead, under the "Stock and interest in incorporated and unincorporated

businesses" category, he listed his "100% Stock Ownership in Brilliant Consulting Service;

Service oriented business.  Has 3 U.S. Patents but subject to fees/costs/expenses of use in

France, Great Britain, Germany, Canada, Japan, and Australia" and he listed the value as zero.[12]

In addition, the Debtor did not list his interest in the License Agreement on Schedule B nor did

he list any claims against PixArt, Nintendo, and others.

At the first meeting of creditors, during a discussion about the License Agreement, the

Trustee asked the Debtor specifically whether he had "any basis to bring litigation against

anyone for anything," and the Debtor replied, "No."  Despite such a statement, the Debtor,

through SyncPoint, filed litigation against PixArt, Nintendo, and others in 2015.

PixArt makes a strong argument that the Debtor should be estopped from claiming

damages in the Patent Case when he failed to disclose that claim in his bankruptcy case and in

---

[12]  Brilliant Consulting Service appears to be the same entity as Brilliant Points mentioned in footnote 2, i.e., the Debtor's authorized agent with respect to the License Agreement.

fact took a position in his bankruptcy case that was inconsistent with the position he and

SyncPoint now take in the Patent Case.  See Browning Mfg. v. Mims (In re Coastal Plains, Inc.),

179 F.3d 197, 208 (5th Cir. 1999) ("Courts in numerous cases have precluded debtors or former

debtors from pursuing claims about which the debtors had knowledge, but did not disclose,

during the debtors' bankruptcy proceedings."); Brandon v. Interfirst Corp., 858 F.2d 266, 268

(5th Cir. 1988) ("Judicial estoppel is a common law doctrine by which a party who has assumed

one position in his pleadings may be estopped from assuming an inconsistent position."); see

also Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987) ("[T]he very purpose of

certain sections of the law . . . is to make certain that those who seek the shelter of the

bankruptcy code do not play fast and loose with their assets or with the reality of their affairs.

The statutes are designed to insure that complete, truthful, and reliable information is put

forward at the outset of the proceedings, so that decisions can be made by the parties in interest

based on fact rather than fiction.").

### c.  Lack of Standing

PixArt asserts that SyncPoint does not have standing to sue for breach of contact since, at

the time SyncPoint filed the Patent Case, the 214 Patent had not yet been assigned to SyncPoint.

SyncPoint disputes this point.  PixArt states that discovery is continuing; however, it believes

that SyncPoint and its counsel engaged in fraudulent post-filing creation of patent assignment

documents to cover up SyncPoint's failure to properly obtain an assignment of the Patent Assets

from the Debtor prior to filing the complaint.  The Debtor testified that while the assignment

documents were re-done to correct an omission, they were completed prior to the filing of the

Patent Case.  At this point, it is difficult to discern whether there is merit to the lack of standing

defense; however, as the Trustee stated at the hearing it will be "a hotly contested issue."

16

### d.  Equitable Estoppel

PixArt also intends to defend the Patent Case on the grounds that SyncPoint should be equitably estopped from pursuing the breach of contract claim as the Debtor believed he had an infringement claim as early as 2007, according to his own testimony, and he knew that PixArt was not paying him royalties based on sales of the CMOS sensors to Nintendo during the entire term of the License Agreement from July 2008 through September 2012.  If PixArt had been made aware of the Debtor's claim during the term of the License Agreement, it could have challenged that claim or the validity of the 214 Patent itself.  If PixArt had won that challenge, it would not have been required to pay any royalties going forward.  By not acting, the Debtor lulled PixArt into inaction as well, never having the opportunity to challenge the 214 Patent and the Debtor's assertion that he was owed royalties.  As noted earlier in this opinion, licensees cannot obtain a refund of royalties paid if a patent is later determined invalid.  In the Trustee's view, PixArt has asserted a strong argument for equitable estoppel.

### e.  Statute of Limitations

PixArt intends to raise a statute of limitations defense to SyncPoint's breach of contract claim.  PixArt contends that the 3-year statute of limitations provision of NH RSA 508:4(I)[13] applies in the Patent Case, given the choice of law provision in the License Agreement which provides that "[t]his AGREEMENT shall be construed, governed, interpreted, and applied in

---

[13]  RSA 508:4(I) provides:

Except as otherwise provided by law, all personal actions, except actions for slander or libel, may be brought only within 3 years of the act or omission complained of, except that when the injury and its causal relationship to the act or omission were not discovered and could not reasonably have been discovered at the time of the act or omission, the action shall be commenced within 3 years of the time the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its causal relationship to the act or omission complained of.

accordance with the laws of the State of New Hampshire (United States of America)." License Agreement § 12.8. SyncPoint disagrees that New Hampshire's statute of limitations provision would apply because (1) in its view the 4-year statute of limitations of the forum state, Texas, would apply instead;[14] and (2) RSA 508:4(I) only applies to "personal actions" and not to arbitration proceedings, like the one the parties now agree will take place to determine SyncPoint's entitlement to royalties.

Given the choice of law provision in the License Agreement, the Court believes that the statute of limitations of New Hampshire and not Texas would apply. Second, the Court notes that SyncPoint raised its cause of action in the Texas Federal Court, i.e., in the context of a "personal action," and, for that reason, RSA 508:4(I) would still apply even though the matter will likely move to arbitration.

The statute of limitations defense matters because it greatly affects any determination of damages. SyncPoint claims it is owed $28 million in unpaid royalties for the entire License Agreement term. However, that liability may be reduced to zero. From the Debtor's testimony, it is clear that he believes that Nintendo has infringed his patent since as early as 2007. However, PixArt's liability under the License Agreement could not have occurred any sooner than the end of the first quarter after which a royalty payment was due under that agreement. The first quarter ended September 30, 2008. PixArt submitted its first royalty calculation report on or about October 13, 2008, and it shows that less than fifty units were sold and that PixArt's sales did not include any sales to Nintendo for the Wii. Thus, the Debtor was aware as of October 14, 2008, that he was not paid any royalties for CMOS sensors sold to Nintendo during

---

[14]  If the 4-year statute of limitations applies, SyncPoint asserts that the unpaid royalties would total $3,927,217.00 with interest. The amount owed would be much less if a 3-year limitations period were to apply.

the first reporting period.  Accordingly, this was the first purported breach of the License

Agreement by PixArt.  Neither the Debtor nor SyncPoint brought suit within three years of that

date, i.e., by October 14, 2011.  Therefore, the Court could find that SyncPoint's claim for

breach of contact is completely barred as the Patent Case was not filed until February 20, 2015.

SyncPoint apparently intends to argue that the License Agreement is a form of

installment contract whereby the statute of limitations would run only against each installment as

it became due.  See General Theraphysical, Inc. v. Dupuis, 118 N.H. 277, 279 (1978)) ("[W]hen

an obligation is to be paid in installments the statute of limitations runs only against each

installment as it becomes due even though the creditor has the option to declare the whole sum

due on default of an installment.").  If the License Agreement were an installment contract, and

because SyncPoint filed the Patent Case on February 20, 2015, SyncPoint would be able to assert

a claim for royalties for the 3-year period before February 20, 2015, i.e., from February 20, 2012,

forward.[15]

PixArt disputes that the License Agreement is an installment contract and that a separate

breach could have occurred each quarter when royalty payments were made.  Instead it contends

that if PixArt breached the License Agreement, it breached it only once, at the commencement of

the contract, when PixArt apparently decided that sales to Nintendo were not covered by the

License Agreement.  The Trustee agrees with this analysis.  See McNamara v. City of Nashua,

629 F.3d 92, 96 (1st Cir. 2011) (suggesting the "installment contract rule" does not apply to "a

---

[15]  Of course the License Agreement terminated on September 30, 2012, so SyncPoint would only be able to recover damages for a relatively short period of time, i.e., from February 20, 2012, through September 30, 2012.  According to SyncPoint, the unpaid royalties for the first, second, and third quarters of 2012 total $770,712.00 with interest.  PixArt contends that the maximum payment for this period would be $462,426.00 with interest, as a substantial percentage of the CMOS sensors were used in Nintendo Wiis outside of protected countries and/or in products that were not licensed products within the meaning of the License Agreement.

claim based on a single distinct event which has ill effects that continue to accumulate over time").

The Court need not decide which side has the stronger argument on this issue or whether the License Agreement is in fact an installment contract.  The Court concludes only that PixArt has a strong statute of limitations defense that would likely reduce any liability under the License Agreement from the $28 million claimed by SyncPoint to an amount that would be less than a $1 million, which would not result in any surplus to the Debtors.

### 4. Conclusion

Given the foregoing, the Court finds it problematic that SyncPoint would recover on its breach of contract claim in the Patent Case, let alone obtain a recovery sufficient to generate a surplus for the benefit of the Debtor.  First, there may be difficulties with its basic claim of infringement.  Second, PixArt has raised numerous defenses, any one of which could derail the Patent Case.  Thus, the Court does not believe that SyncPoint has established a "reasonable chance of prevailing on its claims" against PixArt in the Patent Case.  See C.R. Stone, 346 B.R. at 50.  The Court finds this Jeffrey factor does not weigh in favor of the SyncPoint Offer but rather in favor of approving the PixArt Offer.

### C. Collectability

Neither PixArt nor SyncPoint really addressed whether any difficulties would be encountered in collecting a judgment against PixArt if SyncPoint were successful in the Patent Case.  No one presented any evidence as to PixArt's financial condition or whether it has any assets in the United States.  As noted by the Trustee, PixArt is headquartered in Taiwan.  The Trustee questioned whether SyncPoint would be forced to go to Taiwan to collect.  In the

Court's view, this <u>Jeffrey</u> factor does not weigh either in favor of approving or disapproving the Motion.

### D. Complexity, Expense, and Delay of Litigation

As discussed above, the Patent Case first involves the determination of whether PixArt infringed the 214 Patent before a court or arbitrator can determine whether PixArt owes any royalties for use of the 214 Patent. Thus, the infringement claims involves a technical analysis but it does not seem overly complex. If infringement were found, the Patent Case would next involve a determination as to the amount of royalties that were due under the License Agreement. This will involve contract law and, again, does not seem overly complex.

As for the expense of litigating the Patent Case, that weighs in favor of the SyncPoint Offer since SyncPoint and its counsel are bearing the full expense for pursuing the case. SyncPoint and PAMH have been fronting the costs and will continue to do so. PAMH has taken the case on a contingent fee basis, which places the burden of litigating on them and removes any burden from the bankruptcy estate.

With respect to delay, unlike the SyncPoint Offer, which depends on success in the Patent Case and which might take years to complete given the possibility and likelihood of appeals, the PixArt Offer would provide creditors with "an immediate and certain payment" of one hundred percent of the unsecured debt in this case. See <u>Jeffrey</u>, 70 F.3d at 187 (explaining the lower court did not abuse its discretion in approving a compromise that "would provide creditors with an immediate and certain payment of a large percentage of the outstanding debt"). Thus, the issue of delay goes against SyncPoint and in favor of PixArt. As courts have noted, "[t]he bankruptcy system works because it processes cases expeditiously." <u>In re Adams</u>, 424 B.R. 434, 437 (Bankr. N.D. Ill. 2010).

Thus, the <u>Jeffrey</u> factor regarding the complexity of the litigation involved, and the expense, inconvenience, and delay attending it, appears neutral.

**E.  Parties' Interests**

Despite being provided with notice of the Motion and the hearing thereon, no creditor filed a response to the motion or appeared at the hearing in order to offer any creditor views on the matter pending before the Court.  PixArt argues that creditors' interests would be best served by approval of the PixArt Offer.  In its view, creditors will not get paid if SyncPoint is allowed to continue the Patent Case while they are certain to get paid under the PixArt Offer.

The Trustee contends that this factor is neutral.  While the creditors have an interest in getting paid, the Debtors have a competing interest in pursuing a possible surplus.  In her view, apparently neither interest supercedes the other.

SyncPoint contends that it and the Debtor will lose out if the Motion is granted.  The Debtor and his family have invested hundreds of hours in the Patent Case.  PAMH has invested thousands of hours and incurred legal fees totaling more than $2 million.  SyncPoint focuses on the Debtor's interest in a surplus to support its position that his interests would be best served by approval of the SyncPoint Offer.  The Debtor and SyncPoint emphasize that any current value to the Patent Assets was clearly created by SyncPoint after the Debtor's bankruptcy discharge as they have invested their own precious time and resources to pursue their claims against PixArt. The Court notes that the Debtors and SyncPoint only had that opportunity because it appears the Debtor failed to properly disclose his claims while in bankruptcy; if he had, the Trustee could

have pursued them on behalf of the bankruptcy estate before the bankruptcy case closed.[16]  Thus, the Debtor's argument in this regard is disingenuous.

The Bankruptcy Code sets forth a scheme for distributing property in chapter 7 cases.  11 U.S.C. § 726.  Pursuant to that scheme, unsecured creditors must be paid, with interest, before any property of the estate is returned to debtors.  11 U.S.C. § 726(a)(2), (5), and (6).  Explicitly the Bankruptcy Code provides for priority in payment to creditors over payment to debtors.[17]  Given that policy, the Court finds that the certainty of payment to creditors through the PixArt Offer over the uncertainty of payment to creditors and a surplus to the Debtors through the SyncPoint Offer warrants a finding that this Jeffrey factor weighs in favor of approving the PixArt Offer.

### F.  Summary

All together, the Jeffrey factors support approval of the compromise the Trustee has put before the Court.  The Court agrees with the Trustee's assessment that SyncPoint does not have a high probability of success on its breach of contract claim.  As for the factors concerning collectability and the complexity, expense, and delay of litigation, the Court finds they are neutral.  With respect to the last factor, consideration of the creditors' interests, as well as the Debtor's interest in a possible surplus in this case, the Court finds that this factor weighs in favor of approval of the Motion as the Bankruptcy Code's distribution scheme supports the Court's

---

[16]  The Debtor testified that prior to filing bankruptcy he believed he had a claim against PixArt under the License Agreement, but that he could not afford to pursue it.  If he had made his belief known to the Trustee and she had determined not to pursue the claim, the Trustee would not be pursuing this matter now.

[17]  See Czyzewski v. Jevic Holding Corp., 137 S. Ct. 973 (2017) (holding a bankruptcy court may not approve a structured dismissal of a chapter 11 case that provides for distributions that do not follow the Bankruptcy Code's ordinary priority rules without the affected creditors' consent).

conclusion that, while it must consider both the creditors' and Debtors' interests, the creditors' interests are paramount and the PixArt Offer provides a certain and immediate recovery to creditors while the SyncPoint Offer does not.

## VI.  CONCLUSION

Given the Trustee's many years of experience, and her and her counsel's professional competence, the Court will defer to the Trustee's business judgment that it is in the best interests of the parties to effectively settle the Patent Case by selling the Patent Assets to PixArt in order to provide a certain and immediate recovery to the Debtors' creditors.  The Court agrees that the settlement of the Patent Case reasonably reflects the value of resolving any claim SyncPoint has for royalties and securing funds to pay creditors without the time, cost, and risk of further litigating the Patent Case.  The Court also finds that the Jeffrey factors weigh in favor of approving the Trustee's settlement.  While the Debtor's possibility of receiving a surplus will be lost, in the Court's view, SyncPoint's possibility of recovery in the Patent Case is slim.  The Court is certain that the SyncPoint Offer and the Patent Case do not provide a recovery to unsecured creditors that exceeds what they will recover from the PixArt Offer in just seven days. For those reasons, the Court shall enter a separate order authorizing the Trustee to sell the Patent Assets to PixArt pursuant to the terms of the PixArt Offer.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

ENTERED at Manchester, New Hampshire.


Date:   April 25, 2017                    /s/ J. Michael Deasy
                                          J. Michael Deasy
                                          Bankruptcy Judge